ORIGINAL

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUN 17 2016

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| ERIC C. DARDEN, as Administrator of the Estate of Jermaine Darden, | § § § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 4:15-CV-221-A |
| v. | § | |
| | § | |
| THE CITY OF FORT WORTH, TEXAS, et al., | § | |
| Defendants. | § | |

---

## DEFENDANT W.F. SNOW'S BRIEF IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

---

Kenneth E. East
State Bar No. 00790622
FOSTER & EAST
9001 Airport Freeway, Suite 675
North Richland Hills, Texas 76180
(817) 788-1111
Fax: (817) 485-2836
ken1@airmail.net

ATTORNEY FOR DEFENDANT
W.F. SNOW

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A. Procedural History and Remaining Claims Against Snow . . . . . . . . . . . . . . . . . . . . . 2

    B. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    A. Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    B. Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    C. Plaintiff's only substantive claim against Snow, for excessive force, fails,
       and he cannot overcome Snow's qualified immunity . . . . . . . . . . . . . . . . . . . . . 23

        1. Excessive force claims, generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        2. The search warrant was properly obtained, and Snow has no possible
           liability in any event for any conceivable allegations related to the warrant
           or it being issued and served as a "no-knock" warrant . . . . . . . . . . . . . . . . . . 24

        3. Snow had the right to detain and use force against Darden . . . . . . . . . . . . . . . . 25

        4. Snow's response to Darden's resistance was measured, minimal,
           and imminently reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        5. Plaintiff cannot meet his burden to demonstrate that Snow violated
           any clearly established right of Darden's . . . . . . . . . . . . . . . . . . . . . . . . . . 29

IV.   CONCLUSION AND PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## TABLE OF AUTHORITIES

### Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Arshad ex rel. Arshad v. Congemi, 08-30061,
2009 WL 585633 (5th Cir. Mar. 9, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Buehler v. City of Austin/Austin Police Dep't, 15-50155,
2016 WL 3085528 (5th Cir. June 1, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Carnaby v. City of Houston, 636 F.3d 183 (5th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Carroll v. Ellington, 800 F.3d 154 (5th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Deshotels v. Marshall, 454 Fed. Appx. 262 (5th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 29

Deville v. Marcantel, 567 F.3d 156 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Elder v. Holloway, 510 U.S. 510 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Estate of Bennett v. Wainwright, 548 F.3d 155 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 28

Foster v. City of Lake Jackson, 28 F.3d 425 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Graham v. Connor, 490 U.S. 386 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Harlow v. Fitzgerald, 457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Harris v. Serpas, 745 F.3d 767, 772 (5th Cir. 2014), cert. denied, 135 S. Ct. 137 (2014) . . . . . . 24

Hudson v. Michigan, 547 U.S. 586 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Hunter v. Bryant, 502 U.S. 224 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Kovacic v. Villarreal, 628 F.3d 209, 211 (5th Cir. 2010),
cert. denied, 131 S. Ct. 2995 (U.S. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Little v. Liquid Air Corp., 37 F.3d 1069 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Malley v. Briggs, 475 U.S. 335 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Matshushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) . . . . . . . . . . . . . . . . 21

Meadours v. Ermel, 483 F.3d 417 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Muehler v. Mena, 544 U.S. 93 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Pearson v. Callahan, 129 S.Ct. 808 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Poole v. City of Shreveport, 691 F.3d 624 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Rakestrau v. Neustrom, 11-CV-1762, 2013 WL 1452030 (W.D. La. Apr. 8, 2013) . . . . . . . . . 31

Reichle v. Howards, 132 S. Ct. 2088 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Richards v. Wisconsin, 520 U.S. 385, 394 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Richardson v. McKnight, 521 U.S. 399 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Rodriguez v. Farrell, 294 F.3d 1276 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Simmons v. Lyons, 746 F.2d 265 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Scott v. Harris, 550 U.S. 372 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Tarver v. City of Edna, 410 F.3d 745 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Mitchell, 73 Fed. Appx. 670 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Constitutions, Statutes, and Rules**

U.S. Const. amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 23, 26, 29

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

TO THE HONORABLE JUDGE OF SAID COURT:

Defendant W.F. SNOW files this his Brief in Support of his Motion for Summary Judgment and asks that the Court dismiss all of the plaintiffs' claims against him and grant final judgment in his favor.  He would respectfully show the Court the following.

## I.

## SUMMARY

A suspect fitting the description of Jermaine Darden, now deceased, and others, sold drugs out of Darden's house to a confidential informant on multiple occasions. Fort Worth Narcotics Unit officers also believed neighbors served as lookouts for the house. Narcotics officers obtained a no-knock narcotics search warrant, issued by a Tarrant County magistrate. They asked a tactical unit, of which Defendant Officer Snow was a member, to serve the warrant.

Defendant Snow was the first officer to enter the house and immediately encountered Darden, who repeatedly and continuously refused Snow's commands to get on the ground and to surrender. After nearly a minute of wrestling with the 340-pound Darden, Snow, even with the help of several other officers could not control Darden and overcome his resistance. Snow deployed his Taser one time with limited success and then once again when Darden still resisted and again raised his upper body up off the ground despite numerous officers struggling to hold him down. Snow used no other force against Darden. Sadly, after finally being restrained, handcuffed, and sat up into a seated position, Darden apparently suffered a fatal heart attack.

Plaintiff, on behalf of Darden's estate and statutory beneficiaries, sues Snow for excessive force. Plaintiff, however, simply cannot meet his burden to demonstrate that Darden suffered an injury, which resulted directly and only from a use of force that was clearly excessive, and the excessiveness of which was clearly unreasonable. Nor can Plaintiff meet his burden to overcome

Officer Snow's entitlement to qualified immunity. Snow was a police officer doing his job in the course and scope of his employment and authority. In using reasonable force against the noncompliant Darden he acted reasonably and violated none of Darden's clearly established rights.

Officer Snow simply did not use excessive force, and he is entitled to qualified immunity.

## II.

## BACKGROUND

### A.    Procedural History and Plaintiff's Remaining Claims Against Snow

The current plaintiff is Eric C. Darden as Administrator of the Estate of Jermaine Darden. Prior to Mr. Darden's substitution into this case as the nominal, representative plaintiff, a number of individual plaintiffs, who are apparent surviving family members and beneficiaries of Jermaine Darden, deceased, initiated this action on March 23, 2015. See Doc. No. 1.

Thereafter, Defendants challenged the original plaintiffs' standing and capacity. See Doc. No. 6. In response, the plaintiffs filed a probate action in a Tarrant County probate court and three times thereafter filed amended complaints, see Doc. Nos. 18, 26, 41 (although the second one was stricken by the Court per Doc. No. 27), finally settling on the current plaintiff to bring claims, per Plaintiff's allegations, on behalf of the estate of Jermaine Darden and "on behalf of the following statutory beneficiaries: Donneika Goodacre-Darden, the surviving wife of Jermaine Darden, Harriet A. Darden, the surviving mother of Jermaine Darden, Charles H. Darden, the surviving father of Jermaine Darden, Dashawn N. Darden and D.D.D. the surviving sons of Jermaine Darden."[1] Doc. No. 66 at 2.

---

[1] The undersigned understands from plaintiff's counsel that  Charles H. Darden passed away on or about March 4, 2016.

Defendant W.F Snow filed his motion to dismiss Plaintiff's Second Amended Complaint (Doc. No. 41), seeking dismissal of all state law claims against him and of all claims brought against him in his official capacity. Doc. No. 42. Defendant Romero filed a similar motion. Doc. No. 44. On August 13, 2015, the Court granted the motions and ordered that "plaintiff's official capacity claims and state law claims against said defendants [Snow and Romero] be, and are hereby, dismissed." Doc. No. 50. On the same day, the court entered final judgment against Plaintiff on those claims. Doc. No. 51.

Finally, on May 11, 2016, Plaintiff sought and obtained leave to amend his complaint yet again, Doc. Nos. 64, 65, and on that day filed his current, live pleading, his Third Amended Complaint. Doc. No. 66. By his current complaint, Plaintiff brings a single substantive claim against Defendant Snow--for "Excessive Force," pursuant to 42 U.S.C. § 1983, "in violation of the Fourth Amendment to the United States Constitution." Pl. 3d Am. Compl. (Doc. No. 66) at 12-14. Plaintiff also seeks punitive damages from Snow. Id. at 22. Defendant Snow has filed an answer asserting his entitlement to qualified immunity from Plaintiff's claims against him. Doc. No. 67 at 10.

## B.     <u>Factual Background</u>

As with any major police department, the Fort Worth Police Department (FWPD) is comprised of many different divisions and units that perform various tasks. One unit is the Narcotics unit, which is charged with, among other things, investigating and enforcing laws related to the use and distribution of controlled substances. App. at 3, 4. The FWPD also has various tactical units, including a Special Weapons and Tactics (SWAT) unit as well as various Zero Tolerance (ZT) units. Id. The ZT units are trained in tactics similar to the SWAT unit, but the ZT units are full-time, on-the-street units that perform a variety of functions, one of which is assisting other units with tactical operations, such as serving warrants, when called to do so. App. at 3.

At all relevant times, including on May 16, 2013, Defendant Officer W.F. Snow was a member of the FWPD's Central Division's ZT Unit.  At all relevant times, including on May 16, 2013, Fort Worth police officer N.B. Danford (not a defendant herein) was assigned to the department's Narcotics Unit. App. at 3, 284.

Prior to May 16, 2013, the Narcotics Unit had been investigating the sale of controlled substances from a house located at 3232 Thannisch Ave., Fort Worth, Texas. App. at 284. Narcotics officers believed that substantial amounts of controlled substances were being sold from that property due to, among other things, 'buy' operations they performed there using a confidential informant (CI), which is a typical investigatory practice of law enforcement. App. at 285. After obtaining enough evidence to present to a magistrate to seek a search warrant, Narcotics Officer Danford prepared and signed an affidavit on May 16, 2013. App. at 285, 289-292. Additionally, the Narcotics Unit had become aware that persons located in a house at 3301 Thannisch, across the street from the subject property, were often staged to serve as lookouts for activity at the subject property. Id. For that reason, in addition to the inherent dangers associated with serving narcotics warrants, Officer Danford believed a slow or obvious approach by police to serve the warrant would be futile, dangerous, and otherwise inhibit the investigation and would lead to the destruction of evidence inside the subject property, and he so stated in his affidavit. App. at 286.

On May 16, 2013, Danford presented his affidavit to a Tarrant County District Court Magistrate, the Honorable Cheyenne Minick.  App. at 285. Judge Minick reviewed the affidavit and signed the proposed Search Warrant (No. SW-27947) on that date. App. at 285, 293-94. The warrant authorized officers to serve the warrant without first knocking or announcing their presence. Id. Officers typically refer to such warrants as 'No-Knock' warrants.' App. at 285. Additionally, Narcotics Officer Danford sought and obtained permission from his supervisor to request the Central

Division ZT Unit of the FWPD to serve the No-Knock warrant using a high dynamic entry technique, which police officers often use when serving warrants under such circumstances in order to utilize speed and surprise and to rapidly secure the premises in order to prevent flight, destruction of evidence, and resistance, including the possible use of weapons by occupants in the subject property. App. at 285-86. Danford believed such steps were necessary and appropriate in this case to prevent injury to officers and persons present in the house, to prevent flight by suspects, and to prevent the destruction of evidence for the reasons stated in his affidavit. Id.

After those actions and decisions, Narcotics Officer Danford contacted the Central ZT Unit's supervisor and requested their assistance. Id. Danford explained to the ZT Unit's supervisor that Narcotics had obtained a No-Knock warrant, signed by a magistrate, and approved for service by a ZT Unit using a high dynamic entry technique. Id. Officers from the ZT Unit, specifically including Defendant Snow, were not involved in the investigation of the subject property or its occupants nor were they involved in obtaining the warrant or seeking approval for its service. Id. Instead they relied on the information provided them by Danford and the Narcotics Unit. App. at 4, 286. It is typical and reasonable police practice for officers to rely on information provided them by other officers. Id.

Defendant William F. Snow is currently employed as a police officer with the FWPD and has been so employed since January 5, 2004. App. at 2. He has an unblemished record as a police officer and is the recipient of a Chief's letter of recognition. Id. He has never received any form of discipline from the FWPD, and, to his knowledge, other than this lawsuit, has never been the subject of any complaint of any nature with respect to his job as a police officer. Id.

On May 16, 2013, Officer Snow was on-duty, working as a member of the Central ZT Unit. He was working a shift that began at 9:00 a.m. and was to end at 7:00 p.m. App. at 3. During his shift that day, he and other members of his ZT Unit were informed by their supervisor that they had

been asked by Narcotics to serve a no-knock warrant at a house located at 3232 Thannisch Ave., Fort Worth, Texas. Id.

Both Narcotics Officer Danford and the ZT supervisor told the ZT officers that the Narcotics Unit had obtained the no-knock warrant following an investigation conducted by the Narcotics Unit, which included a number of drug buys by a CI at the subject property. Danford also told them that the Narcotics Unit was aware that occupants of the subject property relied on occupants of a house across the street to serve as lookouts, and Danford or the supervisor or both stated Narcotics believed that the lookouts would likely alert occupants of the subject property to any police presence, thus affording them time to destroy evidence or prepare for officers' approach. Id.

Danford, therefore, the officers were told, had obtained permission in the warrant and from his supervisor for the warrant to be served as a no-knock warrant. Danford and the ZT supervisor advised the ZT officers that the main suspects in the investigation included a very large black male believed to weigh over 300 pounds as well as an older black female. Officer Snow never personally had a copy of, nor saw, the search warrant nor the affidavit supporting it. He relied on the information provided to him by his supervisor and by Danford. App. at 3-4

Following that briefing, members of the ZT unit, including Snow, got into an unmarked car and drove to the subject property in order to perform a brief review of the scene to make sure they were prepared to safely serve the warrant. App. at 4. As they drove past the subject property, 3232 Thannisch, they observed persons in the yard of the house across the street. Id.

With respect to serving the warrant, Officer Snow was assigned to the entry team. App. at 4. The entry team was tasked with entering through the front door of the subject house after Officer Sutherland breached it with a ram, and securing the premises and its occupants so that they could not escape, harm officers, or destroy evidence. Other members of the entry team included Officers

Chavez, Brady, Gray, Ricks, and Tabor. Defendant Officer Romero and others were assigned to the perimeter teams--assigned initially to stay outside and look for outside threats and for persons who may flee from the subject property. Officer Johnson was assigned to be the team leader. MedStar Ambulance Service was asked to stage an ambulance nearby in case of any injuries that may result to officers or occupants of the subject property during the service of the warrant. App. at 4.

Shortly before 4:00 p.m. on May 16, 2013, the ZT team boarded a transport vehicle (van) to go to the subject property. Id. All officers, including Snow, were wearing clearly-marked Fort Worth Police uniforms. (Snow is aware of allegations in the plaintiff's complaint concerning comments made during the van ride. Snow, however, was seated at the opposite end of the van from where the alleged comments were made and never heard the comments mentioned in the complaint nor anything remotely similar during the ride to the subject property. Snow certainly was not engaged in any racially insensitive dialogue, nor was he in any way whatsoever at any time motivated by any thoughts of race.) Id.

Once at the subject property, at approximately 4:10 p.m., ZT officers quickly exited the van. App. at 4. Much of what transpired was captured by two GoPro video cameras (with audio) mounted to the helmets of entry team members Chavez and Gray. App. at 1, 2, 278-83. Various versions of those videos are submitted herewith. App. at 1. They include the following: the two complete, original video files; two video files that are excerpts from those videos but cover the period of time only from just before officers make entry into the subject house through the moment when Jermaine Darden is finally detained; and a compilation video, which includes the relevant time period from each video, set side-by-side, synched in time. App. at 2; see also App. at 278-83.

Snow followed Officer Sutherland to the front door, and, immediately after Sutherland breached the door, Snow was the first officer to enter the house. Immediately upon entry, Snow and

other officers loudly yelled, 'Police! Get down! Police! Get on the ground! (Snow, incidentally, never used any profanity. No officer in the house ever said any words of a racial nature.) App. at 4.

When the door was rammed open by Officer Sutherland, Snow immediately noticed that directly in front of the door, several feet into the first room, there was a very large black male fitting the suspect description on a couch with his knees on the seat of the couch. App. at 4. His body was facing backward over the couch, and he was vertical, looking in the direction of the front door and the approaching officers, as is truly and accurately depicted in these still images taken from a video of the incident (Snow is the officer pictured entering the house) (App. at 4-5):





Being the first officer to enter, Snow went directly to the large male on the couch, who was later identified as Jermaine Darden. App. at 5. (Contrary to claims by plaintiff, Darden plainly was not asleep when officers entered the house. App. at 5, 110-111.) Snow repeatedly yelled 'Get down! Get on the ground!' or similar commands, but Darden did not comply. App. at 5. Other officers followed Snow into the house.  Seeing that Snow was approaching Darden, other officers moved past him and continued straight into the back rooms of the house, and still other officers turned right, just before the couch, into the dining room of the house where several other persons were present. Id.

When Snow reached Darden, he continued telling Darden to get down and tried to grab Darden to move him off the couch, toward the floor. App. at 5. Subjects who are on the ground pose much less of a threat to police, and in this case Snow had reason to fear that Darden, due to his unusual position on the couch, may be trying reach over the back of the couch for a weapon. App. at 5. When Snow tried to get Darden on the ground all he initially was able to do was grab the back of Darden's shirt, which ripped off his body when Snow pulled it (see this image, which truly and accurately depicts that moment). App. at 5-6.



Darden then began standing up. App. at 6. Snow then holstered his gun and tried again to move Darden to the ground. Id. Snow struggled with Darden for over half a minute trying to get him on the ground. Id. Finally, with the help of other officers, who saw and heard the struggle, they were able to get Darden on the ground, but Darden still continued actively to resist and to refuse officers' commands to stay down, to stop moving, and to give officers his hands. Id.

Even with several police officers attempting to wrestle Darden into compliance, Darden continued resisting and continued trying to get himself up off the ground. App. at 6. None of the officers had any way of knowing why Darden was resisting, and none knew if any weapons may have been within an arm's reach of Darden during the struggle. Id. Snow knew that Darden was not complying with commands to surrender and that he was continuing actively to resist their efforts to control him. Snow now knows from the videos that one or more persons stated that Darden could not breathe, but even if Snow heard those comments at the time, he was focused on containing a resisting subject and could not know if such claims were true or if, instead, as it appeared, Darden was struggling to escape or possibly reach for a weapon or otherwise harm officers. At more than one point, even after being placed in a prone position, Darden would push himself up, sometimes all the way up vertically onto his knees. Finally, after what seemed to Snow like a very long period of time (which we now know based on the video evidence to have been nearly a full 45 seconds) struggling to gain compliance from Darden (unsuccessfully, even with the help of other officers), Snow stood up and removed his TASER X2 electronic control device (ECD) (or conducted energy weapon (CEW)). App. at 6.

The Taser X2 is a newer model of the Taser device than the Taser X26, which the FWPD used prior to receiving X2s. App. at 6. Both devices are substantially similar, but the X2 contains a single, dual-chamber, cartridge, which contains two sets of probes and wires instead of only one.

When used in probe mode, as in this case, a trigger pull discharges a single set of probes, attached to wires, that fire forward. If both probes make contact with a subject, the circuit completes for five seconds and the subject will experience pain and likely become at least briefly incapacitated at least with respect to any muscles located between the two probes. A second trigger pull of the X2 will similarly discharge the second set of probes. App. at 6.

After Darden had again pushed himself up (see this image, which truly and accurately depicts that moment),



Snow announced, "Taser, Taser," and deployed the first of the two sets of probes his Taser device carried. App. at 7. The distinctive pop of Snow's first deployment of the Taser device can clearly be heard at the 02:58 mark on the full GOPRO007 video. The probes both hit Darden in his back, and he briefly went back down to a prone position on the ground. But as soon as the 5-second cycle from the Taser ended, if not slightly before, Darden again began raising himself up to a "push-up" position (see the following image, which truly and accurately depicts that moment at the 03:03 mark on the full GOPRO007 video). App. at 7.



Officers continued struggling with Darden for another approximately 11 seconds, and one of the officers then called for Snow to deploy his Taser again. Snow's second and final deployment of his Taser can clearly be heard at the 03:14 mark on the full GOPRO007 video when Darden has again raised himself to a vertical position (see the following image, which truly and accurately depicts that at the 03:15 mark on the full GOPRO007 video). App. at 8.



As confirmed by Snow's own memory, by the videos, and by the download report from his Taser X2, Snow deployed his Taser device only two times, and after each deployment the device deployed for exactly five seconds. No other officer deployed a Taser or any other weapon against Darden. App. at 9, 16.

Even after the second deployment of the Taser device, Darden continued to resist and struggle against officers for another approximately 53 seconds (see from 01:09 to 02:04 on the full GOPRO018 video) until he was finally secured. App. at 9. During that 53-second period of time, officers tried repeatedly to secure Darden and yelled repeatedly at him to stop moving and to give his hands to the officers.  Yet, as can plainly be seen on the videos, Darden repeatedly pulled away from the officers' attempts to secure his hands.  (See, e.g., the following images, which truly and accurately depict some of those moments at the 01:31 and 01:40 marks on the full GOPRO018 video.)





Other than his initial contact with Darden (when he ripped his shirt), helping wrestle him to the ground the first time, and his two Taser device deployments, Snow never again touched Darden. After the second Taser probe deployment, Snow continued to hold his Taser device, prepared to reactivate it if necessary, but, despite Darden's continuing resistance, Snow never again activated the device or personally used any other force against Darden, as he believed enough officers had become involved at that point and Darden was no longer lifting himself to a vertical position (but was continuing to pull his hands away from officers and resist being handcuffed). App. at 9.

Finally, nearly two full minutes after he first encountered Darden and told him to get on the ground, and after a very significant struggle, officers were finally able to get Darden secured. Officers then raised Darden up, seated, into a recovery position (which officers are trained to do as that is a more comfortable position that allows suspects to breathe easier than if they are left in a prone position), and no officer ever used any further force against him. App. at 10.

Because Taser probes had been used against Darden, per FWPD policy, officers immediately called for an ambulance to respond to the scene in order to check the welfare of Darden and to remove the probes. Unfortunately, after ambulance personnel arrived, Darden was later pronounced dead, having apparently (per the medical examiner's report), but unbeknownst at the time to officers, suffered a fatal heart attack sometime after his struggle with officers. App. at 10

After the scene was secured, officers from the Narcotics Unit searched the premises and recovered a number of items, including various narcotics, as follows:

Item # 1- 3 green baggies and 2 clear baggies containing 2.4grams of white powder
Item # 2- 11 capsules containing 1.8 grams of brown powder
Item # 3- small clear baggy with 0.144oz of green leafy
Item # 4- 0.123oz of green leafy substance in a brown cigar
Item # 5- clear freezer size baggy containing 2.5oz of green leafy
Item # 6- clear plastic baggy containing 0.105oz of green leafy.
Item # 7- 0.024oz of green leafy substance in a brown
Item # 8- clear plastic baggy containing 0.229 of green leafy substance
Item # 9- $101 US Currency $1x11;$5x2;$10x4;$20x2
Item # 10- $164 US Currency $1x4;$5x2;$10x3;$20x2;$100x1
Item #11- Samsung flip cell phone silver in color
Item #12- Metro PCS LG flip phone black in color
Item #13- Samsung Metro PCS touch screen phone
Item #14- Digital scale black in color
Item #15- correspondence addressed to Jermaine Darden
Item #16- a time card for Orlando Cook
Item #17- a 1st National Bank Mastercard
Item #18- bulk amount of .22 caliber ammunition

Those items later tested positive for 2.4 grams of cocaine, 1.8 grams of heroin, and 3.125 ounces of marijuana. Several arrests were made. Snow and his ZT unit, however, were not involved in the search. App. at 10, 286-87.

Snow never used any force against Jermaine Darden other than the limited force described above, which he believed was reasonable and necessary to safely secure Darden and to prevent him from escaping or harming him or other officers. Snow had no prior knowledge of any of Darden's significant preexisting health problems, and Snow intended him no harm. Snow was acting at all times in the course and scope of his employment and authority, in a reasonable manner, and in a manner that is consistent with his training and with standard police practices. App. at 10.

Darden's body was examined by the Tarrant County Medical Examiner's Office. App. at 32. After a full autopsy and investigation, Darden's cause of death was ruled a sudden cardiac death and the manner of death was ruled to be "natural." App. at 34. Significant to the medical examiners' rulings, as stated in the autopsy report, and as explained in more detail by Tasha Z. Greenberg, M.D., in her affidavit, autopsy findings "included features of hypertensive atherosclerotic cardiovascular disease with focally severe coronary atherosclerosis including greater than 90% stenosis of the left anterior descending coronary artery and concentric left ventricular hypertrophy." App. at 27. His heart was enlarged. Id. He was obese, weighing 340 pounds with a body mass index of 52. App. at 27, 35. "Histologic examination of the organs showed features consistent with gross observations in the heart and lungs, with hypertrophic or enlarged cardiac myocytes, severe coronary atherosclerosis, pulmonary congestion and edema, as well as identifying hepatic steatosis or fatty change and chronic thyroiditis or inflammation in the thyroid gland." App. at 27. And "toxicology testing was positive for XLR-11, a synthetic cannabinoid [and reported cardiotoxin], in the aortic blood." Id.

As Dr. Greenberg summarized, at the time of his death, Jermaine Darden "had multiple risk factors for sudden cardiac death, including severe coronary stenosis due to atherosclerosis, hypertrophy of the left side of the heart with cardiomegaly, obesity, fatty liver and thyroiditis, as well as use of a potentially cardiotoxic synthetic cannabinoid drug. The severity of his cardiac disease alone made him susceptible to sudden cardiac death at any time, with or without physical exertion." App. at 28.

As stated in the autopsy report, the Taser device did not cause Jermaine Darden's heart attack (App. at 34), nor could it have. Mark Kroll, Ph.D., is a biomedical engineer who specializes in electrophysiology and holds more patents on medical devices than any other person in the world (more than 300), such that, until recently, each and every Implantable Cardioverter Defibrillator (ICD) made anywhere in the world, implanted in over one million people, licensed some of Dr. Kroll's patented improvements. App. at 151. Dr. Kroll explains in great detail in his affidavit and report that the Taser ECD, especially as it was used in this case, did not and could not have caused Darden's death, if for no other reason than Darden is seen on the video continuing to pull his hands away from officers and resist them well after the last Taser cycle. App. at 170. And he explains why the Taser device was an ideal choice for officers to use in a case such as this in light of its well-documented history of significantly reducing injuries to both officers and suspects alike. App. at 161, 187.

Michael M. Cosgrove is a former SWAT commander in Miami, Florida, who has held every rank in law enforcement including acting chief of police, is a law enforcement and use of force professional, educator, and consultant with over 30 years' experience, and has served as an expert in over 500 cases (usually for plaintiffs). App. at 62, 63, Mr. Cosgrove testifies in his affidavit that the actions of all officers, including Officer Snow, was reasonable, necessary to counter the

continuing and active resistance of Darden, and consistent with Fort Worth police training and with customary police practices. App. at 57-60.

Other occupants of the house at the time police served the warrant include the following: Donald Raynell Virden, a cousin of Jermaine Darden's, who was staying at the house; Orlando Cook, a longtime friend of Jermaine Darden's, who was staying at the house (Cook was arrested at the scene for possession of heroin and later pleaded guilty to the charge); Donna Randle, who is Jermaine Darden's biological mother and who was staying at the house (Randle's legal custody of Jermaine Darden was forfeited when Harriet Darden, Jermaine's grandmother, adopted him shortly after his birth); Clifton Crippen, a visitor to the house who was an acquaintance of Cook's; Hunter Rutledge (had gone to the house with Crippen); and Lonnie Turner (fled out of the back of the house and was captured when police arrived).

These witnesses, most of whom are represented by plaintiff's counsel in this case and appear to be sympathetic to the plaintiff, have nonetheless largely testified to facts *consistent* with those described above. Donna Randle, Jermaine Darden's birth mother, testified that as she told police investigators, she knew occupants in the subject house were smoking synthetic marijuana. App. at 93. She knew or at least strongly suspected Jermaine Darden had significant preexisting health problems, including asthma, as well as suspected and untreated narcolepsy and sleep apnea. App. at 94-95. The condition was so bad, she testified, that Jermaine was forced to sleep at night with his knees on the floor and his upper torso leaned against his bed. App. at 95. He could not breathe in a horizontal position, but like she acknowledged, officers could not have known that. Like most all of the witnesses, Ms. Randle acknowledges that it would have appeared to officers that Jermaine Darden was resisting them. App. at 99. But she and other witnesses assume that Darden's apparent

resistance was because he was trying (unbeknownst to officers) to get himself into a position that made it easier for him to breathe. Ms. Randle testified:

> 12 Q. (BY MR. EAST) On the date of the incident in
>
> 13 question, is it your position that the police thought
>
> 14 Jermaine was fighting them, but really he was trying to
>
> 15 get into a better position, so he could breathe easier?
>
> 16 A. Yes.
>
> 17 Q. And that's what you told police, right?
>
> 18 A. Yes.

App. at 99.  She later confirmed her statements:

> 25 Q. And it was your earlier testimony that the
>
> 1 officers believed he was fighting them, but in reality,
>
> 2 he was trying to get into a more comfortable position?
>
> 3 A. Right.

App. at 103.

Likewise, Clifton Crippen testified that Darden was struggling against the officers trying to get on his side. App. at 111. He agreed that Darden was trying to turn over against the efforts of the officers, and he confirms that Darden was big and strong enough to have prevented even several officers from effectively controlling him. Id. Crippen agrees that a Taser was used by officers because they thought Darden was resisting. App. at 113.

Donald Raynell Virden testified that he and others were smoking weed. App. at 126. He also testified that Darden was repeatedly raising up as the officers were trying to control him. App. at 125, 124.

Orlando Cook testified that there were drugs in the house. App. At 130. He agrees that when officers were trying to handcuff Darden, he was pulling away. App. at 139.

Harriet Darden, Jermaine's Darden biological grandmother and also his adoptive mother, testified that she also knew Jermaine needed to sleep on his knees in order to be able to breathe comfortably. App. at 144. She had heard Jermaine Darden may have used drugs. Id.

Although it is certainly sad and unfortunate that Mr. Darden died, it was not the result of any unconstitutional actions. The minimal, restrained force Officer Snow used against Mr. Darden was more than reasonable under the circumstances. His deployment of his Taser device was intended to bring the struggle with the large, powerful Darden to a quicker end than relying solely on the up-until-then-futile efforts of officers to wrestle Darden into compliance. Moreover, the Taser was deployed in a reasonable and typical manner after Darden had continued to struggle and had continued trying to raise himself up, presenting greater danger to the officers and greater potential for him reaching some potential unknown weapon. The Taser device is a well-accepted tool of law enforcement, designed to minimize injury to suspects and police alike and its use in this case, against an actively resisting suspect, posing an unknown, potentially deadly threat to law enforcement officers, was more than reasonable and did not and could not have caused Darden's death in any event. Its use was also consistent with Snow's training and FWPD policies. FWPD conducted a critical police incident investigation following this incident, and the investigation was reviewed by Snow's chain of command, which confirmed that Snow had not acted improperly or in violation of FWPD policy. App. at 10-11.

## III.

## ARGUMENT AND AUTHORITIES

### A. Summary Judgment Standard

A court "shall grant summary judgment if a movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To show entitlement to summary judgment, the movant need only point out factual deficiencies in claims on which the nonmovant bears the burden of proof. Matshushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Once the movant meets his initial burden, he is entitled to summary judgment unless the nonmoving party comes forward with evidence establishing each of the challenged elements of the case upon which he will bear the burden of proof at trial and setting forth specific facts showing that a genuine issue exists for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986); Matshushita Elec. Indus. Co., 475 U.S. at 587.

Here, Plaintiff has the burden to prove not only the viability of his own claims but also the inapplicability of Defendant Snow's claim to qualified immunity. Kovacic v. Villarreal, 628 F.3d 209, 211 (5th Cir. 2010) cert. denied, 131 S. Ct. 2995, 180 L. Ed. 2d 821 (U.S. 2011) ("Once a defendant invokes qualified immunity, the burden shifts to the plaintiff to show that the defense is not available.") (citing McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (en banc)).

The mere allegation of a factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. For the non-moving party to show that the issues of fact are "genuine," they must have a real basis in the record. Matshusita, 475 U.S. at 586. The nonmovant must show more than some metaphysical doubt about the facts. Id. Unsupported, conclusory allegations are insufficient. Simmons v. Lyons, 746 F.2d 265, 269 (5th Cir. 1984). In other words, the nonmovant cannot defeat summary judgment simply by raising abstract or

theoretical possibilities and must do more than merely produce a scintilla of evidence.  <u>Little v.</u> <u>Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994).  And there is no genuine issue for trial if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. <u>Matshusita</u>, 475 U.S. at 597.

Finally, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007). That rule is of particular importance, where, as here, there is clear, indisputable video evidence. In such cases, courts should "view[] the facts in the light depicted by the videotape." <u>Id.</u> at 381; <u>see also</u> <u>Carnaby v. City of Houston</u>, 636 F.3d 183, 187 (5th Cir. 2011) ("Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene.").

## B.  <u>Qualified Immunity</u>

The doctrine of qualified immunity protects both public officials and the public.  It affords public officials protection "from undue interference with their duties and from potentially disabling threats of liability." <u>Elder v. Holloway</u>, 510 U.S. 510, 514 (1994). At the same time, it protects "the public from unwarranted timidity on the part of public officials." <u>Richardson v. McKnight</u>, 521 U.S. 399 (1997) (quoting <u>Butz v. Economou</u>, 438 U.S. 478 (1978)).  It addresses the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 806 (1982).

Public officials sued in their individual capacities are presumed to enjoy qualified immunity, which is an immunity from the lawsuit itself, not merely from liability.  <u>Hunter v. Bryant</u>, 502 U.S.

224, 227 (1991). Qualified immunity is the rule, not the exception. <u>Foster v. City of Lake Jackson</u>, 28 F.3d 425, 428 (5th Cir. 1994) ("Abrogation of qualified immunity is properly the exception, not the rule.")

Analysis of qualified immunity claims involves one or both of the following: the determination as to whether the plaintiff demonstrated a violation of a clearly established constitutional right; and, if so, whether, at the time of the alleged violation the right was so clearly established a reasonable official in the defendant's situation would have understood that his conduct violated the right. <u>Pearson v. Callahan</u>, 129 S.Ct. 808, 821, 172 L.Ed.2d 565 (2009).

Qualified immunity is designed to shield from civil liability "all but the plainly incompetent or those who knowingly violate the law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986). Its protection "applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" <u>Pearson</u>, 129 S.Ct. at 822-23.

## C.   <u>Plaintiff's only substantive claim against Snow, for excessive force, fails, and he cannot overcome Snow's qualified immunity</u>

### 1.   Excessive force claims, generally

Plaintiff's claim of excessive force against Officer Snow is to be analyzed under the Fourth Amendment and its reasonableness standard. <u>Graham v. Connor</u>, 490 U.S. 386 (1989). To prevail on his Fourth Amendment excessive-force claim, Plaintiff must establish "(1) injury, (2) which resulted directly and only from a use of force that was *clearly excessive,* and (3) the excessiveness of which was clearly *unreasonable."* <u>Deville v. Marcantel</u>, 567 F.3d 156, 167 (5th Cir. 2009) (emphasis added); <u>Tarver v. City of Edna</u>, 410 F.3d 745, 751 (5th Cir. 2005)). Courts should not second-guess an officer's judgment, should not expect the officer to have followed the most prudent course of conduct as judged by 20/20 hindsight, and should not forget that the "calculus of

reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving . . . ." Graham, 490 U.S. at 390.

When a plaintiff claims excessive force against multiple defendants, a court "must also assess the reasonableness of each defendant's actions separately, even if those defendants acted in unison. Meadours v. Ermel, 483 F.3d 417, 422 (5th Cir. 2007).

Officer Snow's conduct thus must be measured on its own and only as of the moment he made his use of force decisions. Harris v. Serpas, 745 F.3d 767, 772 (5th Cir. 2014), cert. denied, 135 S. Ct. 137, 190 L. Ed. 2d 45 (2014) (citing Bazan ex rel. Bazan v. Hidalgo Cnty., 246 F.3d 481, 489 (5th Cir. 2001)). "Therefore, any of the officers' actions leading up to the [use of force] are not relevant for the purposes of an excessive force inquiry in this Circuit." Id. This means, here, that even if Plaintiff argues the search warrant was somehow improper or that it should not have been served in the manner it was served, those matters simply are not relevant to the use of force analysis with respect to Officer Snow's response to the noncompliant, resisting Darden.

**2.   The search warrant was properly obtained, and Snow has no possible liability in any event for any conceivable allegations related to the warrant or it being issued and served as a "no-knock" warrant**

As discussed above and as is undisputed (see, e.g., testimony of plaintiff Eric Darden, Snow MSJ App. at 149), Snow had nothing to do with obtaining the no-knock warrant nor the decision to serve it as such. Moreover, absent any showing that the magistrate's decision was tainted (a claim that does not exist and could not be asserted against Snow in any event as he had absolutely nothing to do with obtaining the warrant), the neutral magistrate's decision to approve the no-knock warrant "insulates" the officers from any liability related to any claims that the intrusion into the house was

without probable cause or that the no-knock entry was unjustified. See Buehler v. City of Austin/Austin Police Dep't, 15-50155, 2016 WL 3085528, at *3 (5th Cir. June 1, 2016).

As the Supreme Court has explained, some states [such as Texas], "reduce police uncertainty while assuring a neutral evaluation of concerns about risks to officers or the destruction of evidence by permitting police to obtain a 'no-knock' search warrant from a magistrate judge, thereby assuring police that a prior announcement is not necessary." Hudson v. Michigan, 547 U.S. 586, 623 (2006). The Court explained that such a procedure provides "an easy way for officers to comply with the knock-and-announce rule." Id. For these reasons, no liability can attach to Snow for the decision to obtain or serve the warrant in the manner it was served.

Even if the warrant or its no-knock service were to be examined, however, it would easily be found to be constitutional. "In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Richards v. Wisconsin, 520 U.S. 385, 394 (1997). "This showing is not high . . . ." Id. Here, the reported presence of lookouts "combined with the easily disposable nature of the drugs," id. at 395, was more than sufficient to justify the no-knock warrant.

### 3.   Snow had the right to detain and use force against Darden

Because officers were serving a no-knock narcotics warrant, it was clearly constitutionally permissible for them to detain the occupants of the house, even using handcuffs, especially with respect to Jermaine Darden, who fit the description of the primary suspect. And when Darden failed to follow Snow's commands and resisted Snow's efforts to place him on the ground, therefore, it was clearly constitutionally permissible for Snow to use reasonable force to gain his compliance. As the

Fifth Circuit has explained, "[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." United States v. Mitchell, 73 Fed. Appx. 670, 671 (5th Cir. 2003) (citing Michigan v. Summers, 452 U.S. 692, 705 (1981). "During that detention, officers may draw their weapons, handcuff the occupants." Id. (citing United States v. Cavazos, 288 F.3d 706 (5th Cir. 2002)).

The Supreme has explained its holding in Summers as follows:

> [O]fficers executing a search warrant for contraband have the authority to detain the occupants of the premises while a proper search is conducted. Such detentions are appropriate, we explained, because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial. We made clear that the detention of an occupant is surely less intrusive than the search itself, and the presence of a warrant assures that a neutral magistrate has determined that probable cause exists to search the home. Against this incremental intrusion, we posited three legitimate law enforcement interests that provide substantial justification for detaining an occupant: preventing flight in the event that incriminating evidence is found; minimizing the risk of harm to the officers; and facilitating the orderly completion of the search . . . .

Muehler v. Mena, 544 U.S. 93, 98 (2005). The Court noted that in Summers it had "stressed" that "the risk of harm to officers and occupants is minimized if the officers routinely exercise unquestioned command of the situation." Id. at 99. "Inherent in Summers' authorization," the Court continued, "to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." Id. (citing Graham, 490 U.S. at 396 ("Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it")).

**4.  Snow's response to Darden's resistance was measured, minimal, and imminently reasonable.**

In Poole v. City of Shreveport, the Fifth Circuit reviewed an excessive force claim by a subject who had been shot with a Taser and had eventually suffered a dislocated elbow after officers had to wrestle with him in response to his refusal to cooperate and be handcuffed. 691 F.3d 624, 628 (5th Cir. 2012). In affirming summary judgment for the officers, the Court explained that "because Poole, upon refusing to turn around and be handcuffed, posed an immediate threat to the safety of the officers and actively resisted the officers' instructions, the use of force was not clearly excessive." Id. at 629.

Here, for nearly 45 seconds, Jermaine Darden failed and refused to comply with Snow's and eventually other officers' commands to get on the ground and to stop resisting their efforts to detain him.  Only after Snow used verbal commands, attempted to pull Darden by his shirt, wrestled with Darden, eventually with the help of other officers, all to no avail, did Snow finally resort to using his Taser. Then Snow deployed it only one time initially, only to be confronted with Darden continuing to resist and raising himself up off the ground at which time, at the behest of fellow officers, Darden deployed the device for the second and last time.  Even after that, Darden continued to actively resist officers for another approximately 53 seconds, but Snow used no force whatsoever against Darden after the second Taser deployment.  As the Court discussed in Poole, here, "when viewed objectively," Officer Snow's actions during that "tense, uncertain, and rapidly evolving" situation were "measured and ascending" and his actions corresponded to Darden's escalating and continuing resistance. Id.

It was certainly objectively reasonable for Snow to believe that Darden's intentions were to escape or to cause him harm, including being fearful that Darden was trying to reach for a weapon

behind the couch or elsewhere while failing to follow Snow's commands. Plaintiff cannot seriously

contend otherwise, given the video evidence.  And Plaintiff's witnesses who were present in the

house do not directly deny it. They, in fact, acknowledge that Darden was not doing what the police

wanted him to do, but they claim that Darden's actual intent was not to escape or to harm officers

but to avoid being prone on the ground because such a position made it difficult for him to breathe.

Plaintiff may claim that persons in the house or even Darden himself expressed this to police

during the struggle, but even if police heard and processed that information in the midst of their

struggle with Darden, they had no way of knowing in that tense, uncertain, and rapidly evolving

situation if the claims were true or false, and even if they were true, they had no way of knowing if

that was all that was motivating Darden or if he was also attempting or intending to escape or cause

them harm. "[A] police officer need not credit everything a suspect tells him. This idea is especially

true when the officer is in the process of handcuffing a suspect." Rodriguez v. Farrell, 294 F.3d

1276, 1278 (11th Cir. 2002) (internal citation omitted).

Also, any claims by Plaintiff that Snow could have gained compliance without using a Taser

miss the mark. Officers are "not required to use the least intrusive degree of force possible . . . The

inquiry is whether the force that was used to effect a particular seizure was reasonable." Arshad ex

rel. Arshad v. Congemi, 08-30061, 2009 WL 585633 (5th Cir. Mar. 9, 2009) (quoting Forrester v.

City of San Diego, 25 F.3d 804, 807-08 (9th Cir. 1994)).  An officer simply is not required to

"perfectly calibrate the amount of force required to protect herself." Estate of Bennett v. Wainwright,

548 F.3d 155, 175-76 (1st Cir. 2008).

Officer Snow used only minimal, reasonable force under the circumstances. He certainly did

not use any force that was clearly excessive or clearly unreasonable.

**5.   Plaintiff cannot meet his burden to demonstrate that Snow violated any clearly established right of Darden's**

Officer Snow's futile attempts to wrestle Darden to the ground and his twice deploying his Taser device against him, in light of Darden's relentless refusal to submit, were all more than reasonable, and Plaintiff certainly cannot meet his burden to point to any clearly established law in sufficiently similar circumstances that shows Snow's actions to have been unconstitutional such that it places the issue beyond debate.

Merely claiming that the law was clearly established in 2013 that it was unlawful to use excessive force, or something similarly vague, is far from enough for Plaintiff to strip Officer Snow of his qualified immunity. As the Supreme Court has explained,

> To be clearly established, a right must be sufficiently clear "that every 'reasonable official would [have understood] that what he is doing violates that right.'" Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2078, 179 L.Ed.2d 1149 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." 131 S.Ct. at 2083.

Reichle v. Howards, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012) (emphasis added). In al-Kidd, the Court emphasized, "We have repeatedly told courts . . . not to define clearly established law at a high level of generality. . . . The general proposition, for example, that an unreasonable . . . seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." 131 S.Ct. at 2084; see also Deshotels v. Marshall, 454 Fed. Appx. 262, 268-69 (5th Cir. 2011) ("As we have held, pre-existing law must dictate, that is,

truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.").

It was lawful and reasonable for Officer Snow to help serve the narcotics warrant in the manner he did. It was lawful and reasonable for him to attempt to detain Darden. It was lawful and reasonable for him to insist on Darden's compliance with his commands to get on the ground. It was lawful and reasonable for him to do nothing more than wrestle with Darden, first alone and then with the help of other officers. And it was lawful and reasonable for him finally to deploy his Taser only two times in order to help the officers protect themselves and gain compliance. It is not Defendant Snow's burden to prove the absence of clearly established law, but see, e.g., Carroll v. Ellington, 800 F.3d 154, 174-75 (5th Cir. 2015). In Carroll, the Fifth Circuit observed as follows:

> The issue, then, is whether an officer's application of a Taser to an unarmed, seated suspect who fails to comply with an order to get on the ground is objectively unreasonable in light of clearly established law. We conclude that it is not. . . . [O]fficers are trained to use nonlethal force to gain compliance if a subject actively resists arrest and does not comply with verbal task directions to get on the ground. Officers are trained in this manner because a police officer who is standing over a suspect who is on the ground has a "position of advantage over that subject," meaning the officer "can control [the subject's] body movement," and that "the subject will offer less resistance."

Here, officers had no way of knowing if Darden was armed or not and had reason to at least be concerned that he may be, and as is obvious from the video evidence, Darden not only refused to follow commands, he actively resisted numerous officers who were trying to wrestle him into compliance. The facts of the present case, therefore, much more clearly justify the actions of Snow

than even those of the officers in <u>Carroll</u>. Certainly if no clearly established law prohibited the officers' actions in that case, Snow is entitled to immunity in this case.[2, 3]

## IV.

## CONCLUSION AND PRAYER

Officer William Snow acted reasonably when he encountered Jermaine Darden, who for an extended time refused to comply with the commands of officers in one of the most inherently tense, uncertain, and rapidly evolving situations police encounter, the service of a narcotics warrant. Snow after first attempting to use verbal commands and open-hand wrestling to gain compliance from the 340-pound Darden, all to no avail, used only limited, reasonable force, proportional to the continuing resistance. He did not use excessive force, and he is entitled to qualified immunity. Because Plaintiff's only claim that could support his wrongful death, survival, and punitive damages claims against Snow--his claim for excessive force--must be dismissed, the other claims likewise cannot survive and should also be dismissed.

---

[2] Even though in <u>Carroll</u>, the Fifth Circuit was examining the state of the law in 2006, Defendant does not believe there has since been any controlling law addressing facts similar to those in Carroll, letalone similar to the facts of the present case, that would change the analysis.

[3] Plaintiff makes passing references in his complaint to "deadly force," but no officer, particularly Snow, ever used any form of deadly force, and Plaintiff cannot present any clearly established law to the contrary. <u>See, e.g.</u>, <u>Rakestrau v. Neustrom</u>, 11-CV-1762, 2013 WL 1452030, at *7 (W.D. La. Apr. 8, 2013) ("Despite Plaintiff's arguments in [their] brief to the contrary, the use of tasers is not comparable to the discharge of a firearm, and tasers are not considered deadly force in the Fifth Circuit, even in cases where the subject died following a tasing incident.) (citing <u>Batiste v. Theriot</u>, 458 Fed. Appx. 351, 354 (5th Cir. 2012)).

For these reasons, Defendant W.F. Snow respectfully prays that the Court grant his motion for summary judgment, dismiss all of the plaintiff's claims and causes of action against him, and enter final judgment in his favor that Plaintiff takes nothing. Defendant prays for all other relief to which he may be entitled.

Respectfully submitted,

Kenneth E. East
State Bar No. 00790622
FOSTER & EAST
9001 Airport Freeway, Suite 675
North Richland Hills, Texas  76180
(817) 788-1111
Fax:  (817) 485-2836
ken1@airmail.net

ATTORNEY FOR DEFENDANT
W.F. SNOW

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2016, I served a copy of this document on the following parties or their counsel of record:

DARYL K. WASHINGTON
State Bar No. 24013714
**WASHINGTON LAW FIRM, P.C.**
325 N. St. Paul St., Suite 3950
Dallas, Texas 75201
214 880-4883
214-751-6685 - fax
dwashington@dwashlawfirm.com

D. Lee Thomas, Jr.
507 W. Central Avenue
Fort Worth, Texas 76164
817-625-8866
817-625-8950 fax
dlthom31@yahoo.com

Laetitia Coleman Brown
Assistant City Attorney
1000 Throckmorton Street
Fort Worth, Texas 76102
817-392-7600
817-392-8359 fax
laetitia.brown@fortworthgov.org
via email

Kenneth E. East