ORIGINAL

FILED
U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS   2016 JUL 26   AM 11: 59
FORT WORTH DIVISION

CLERK OF COURT

| | |
|---|---|
| ERIC C. DARDEN, as Administrator of the § | |
| Estate of Jermaine Darden, § | |
| Plaintiff, § | |
| § | CIVIL ACTION NO. 4:15-CV-221-A |
| v. § | |
| § | |
| THE CITY OF FORT WORTH, TEXAS, et al., § | |
| Defendants. § | |

---

## DEFENDANTS' APPENDIX IN
## SUPPORT OF THEIR RESPONSE TO PLAINTIFF'S
## MOTION TO STRIKE AND/OR EXCLUDE DEFENDANTS'
## DESIGNATED EXPERT AND ACCOMPANYING TESTIMONY

---

Defendants W.F. Snow, J. Romero, and the City of Fort Worth, Texas, jointly file this their

Appendix in Support of Their Response to Plaintiffs' Motion to Strike and/or Exclude Defendants'

Designated Expert and Accompanying Testimony:

| Exh. | Description | App. pages |
|------|-------------|------------|
| A | Report of Tasha Greenberg, M.D., with CV | 1-18 |
| B | Autopsy Report - Jermaine Darden | 19-37 |
| C | Excerpts from the deposition of Tasha Greenberg, M.D. | 17-20 |

Respectfully submitted,

Kenneth E. East
State Bar No. 00790622
FOSTER & EAST
9001 Airport Freeway, Suite 675

Defendants' Appendix in Support of their Response to Plaintiff's Motion to Strike Expert          Page 1

North Richland Hills, Texas  76180
(817) 788-1111
Fax:  (817) 485-2836
ken1@airmail.net

ATTORNEY FOR DEFENDANT
W.F. SNOW

Laetitia Coleman Brown
Senior Assistant City Attorney
State Bar No. 0072417
1000 Throckmorton Street
Fort Worth, Texas 76102
(817) 392-7600-Telephone
(817) 392-8359-Telefacsimile
email:  laetitia.brown@fortworthgov.org

ATTORNEY FOR DEFENDANT,
CITY OF FORT WORTH

D. Lee Thomas, Jr.
State Bar No. 19847500
507 W. Central Avenue
Fort Worth, Texas 76164
817-625-8866
817-625-8950 fax
dlthom31@yahoo.com

ATTORNEY FOR DEFENDANT,
J. ROMERO

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2016, I served a copy of this document on the following parties or their counsel of record:

DARYL K. WASHINGTON
State Bar No. 24013714
**WASHINGTON LAW FIRM, P.C.**
325 N. St. Paul St., Suite 3950
Dallas, Texas 75201
214 880-4883
214-751-6685 - fax
dwashington@dwashlawfirm.com

Laetitia Coleman Brown
Assistant City Attorney
1000 Throckmorton Street
Fort Worth, Texas 76102
817-392-7600
817-392-8359 fax
laetitia.brown@fortworthgov.org
via email

D. Lee Thomas, Jr.
507 W. Central Avenue
Fort Worth, Texas 76164
817-625-8866
817-625-8950 fax
dlthom31@yahoo.com

Kenneth E. East

A

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

ERIC C. DARDEN, as Administrator of the   §
Estate of Jermaine Darden,   §
      Plaintiff,   §
  §    CIVIL ACTION NO. 4:15-CV-221-A
v.   §
  §
THE CITY OF FORT WORTH, TEXAS, et al.,§
      Defendants.   §

### DEFENDANT W.F. SNOW and J. ROMERO'S DISCLOSURE OF EXPERTS

TO THE HONORABLE JUDGE OF SAID COURT:

Pursuant to the Court's Order Setting Schedule and Providing Special Pretrial Instructions

(Doc. No. 56), as amended (Doc. No. 59) and Fed. R. Civ. P. 26(a)(2), Defendants W.F. Snow and

J. Romero serve this their Disclosure of Experts, and would respectfully show unto the Court as

follows:

**I.**

**Witnesses required to provide a written report. Fed. R. Civ. P. 26(a)(2)(B)**

Michael M. Cosgrove
1075 Wetland Ridge Circle
Middleburg, FL 32068
Telephone: 954-684-7255
E-mail Address: veritasmmc@aol.com
REPORT ENCLOSED

Mark W. Kroll, PhD, FACC, FHRS, FIEEE, FAIMBE
Box 23
Crystal Bay, MN 55323 USA
1-805-428-1838
mark@kroll.name
REPORT ENCLOSED

DEFENDANT W.F SNOW and J. ROMERO'S DISCLOSURE OF EXPERTS           PAGE 1



**Defs. Resp Mtn Exclude App. 2**

Tasha Zemrus Greenberg, M.D.[1]
200 Feliks Gwozdz Pl., Fort Worth TX 76104
Office (817) 920-5700 x 8364
Fax (817) 920-5713
nce_tzgreenberg@tarrantcounty.com
REPORT ENCLOSED

## II.

### Witnesses not required to provide a written report. Fed. R. Civ. P. 26(a)(2)(C)

Without waiving the right to challenge any other parties' attempt to elicit testimony from any non-retained expert witness that exceeds the scope and intent of Fed. R. Civ. P. 26(a)(2), Defendant may call the following persons (for purposes consistent with the scope and intent of Fed. R. Civ. P. 26(a)(2)), who are not retained or specially employed to provide expert testimony in this case and who are not regularly employed by the defendant to provide expert testimony, to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence. Defendant also reserves the right to challenge the testimony of any person listed below should another party attempt to offer testimony from the person that is unreliable or for which the person is unqualified to opine.

1.      Defendant Officer W.F. Snow by and through his undersigned attorney, Kenneth E. East, 9001 Airport Freeway, Suite 675, North Richland Hills, Texas 76180, 817-788-1111.

Based on his years' of experience as a police officer, his firsthand memory of the incident in question, and his review of the available video footage of the incident in question and the other case documents in the critical police incident report package, this officer is expected to testify as to the reasonableness of the actions at all relevant times of the police officer defendants herein,

---

[1] Dr. Greenberg is a fact witness, a non-retained expert, and a retained expert.

**Defs. Resp. Mtn Exclude App. 3**

including that the officers acted reasonably at all times during their entry into the home and service of the warrant and their interaction with Jermaine Darden and that the defendant officers violated none of Plaintiffs' or Jermaine Darden's clearly established rights. The witness is expected to testify that the force used by each officer at all relevant times was reasonable and not violative of any person's clearly established rights. The witness is further expected to testify that the defendant officers acted in reasonable reliance on the information provided them by fellow officers and in reliance on the probable cause found by an independent magistrate to serve the warrant. The witness is expected to testify that the force used, including the actions that led to Plaintiff being on the ground, exposed to a Taser, and handcuffed was reasonable and that the injury or illness suffered by Jermaine Darden was not the result of any excessive use of force or any other alleged improper action or inaction by defendants.

2.      Defendant Officer J. Romero, by and through his attorney of record, D. Lee Thomas, Jr., 507 W. Central Avenue, Fort Worth, Texas 76164, 817-625-8866.

Based on his years' of experience as a police officer, his firsthand memory of the incident in question, and his review of the available video footage of the incident in question and the other case documents in the critical police incident report package, this officer is expected to testify as to the reasonableness of the actions at all relevant times of the police officer defendants herein, including that the officers acted reasonably at all times during their entry into the home and service of the warrant and their interaction with Jermaine Darden and that the defendant officers violated none of Plaintiffs' or Jermaine Darden's clearly established rights. The witness is expected to testify that the force used by each officer at all relevant times was reasonable and not violative of any person's clearly established rights. The witness is further expected to testify that the defendant

**Defs. Resp. Mtn Exclude App. 4**

officers acted in reasonable reliance on the information provided them by fellow officers and in reliance on the probable cause found by an independent magistrate to serve the warrant. The witness is expected to testify that the force used, including the actions that led to Plaintiff being on the ground, exposed to a Taser , and handcuffed was reasonable and that the injury or illness suffered by Jermaine Darden was not the result of any excessive use of force or any other alleged improper action or inaction by defendants.

  3.  All police officers who witnessed all or part of the incident, were involved in any way in any work done in preparation for the service of the warrant at issue herein, were involved in any investigation or review of the incident, or otherwise have knowledge relevant to this lawsuit. Such individuals can be reached through Laetitia Coleman Brown, Attorney for Defendant City of Fort Worth, Laetitia Coleman Brown, Fort Worth City Attorney's Office, 1000 Throckmorton St., Fort Worth, Texas 76102, 817-392-6639. Otherwise, their work address generally is Fort Worth Police Department, 350 West Belknap Street Fort Worth, TX 76102, (817) 392-4000. Such other police officers include, but are not limited to the following:

| DANFORD,NB #2506 | drafted search warrant and related documents, wrote incident report |
| --- | --- |
| C.M. Gilmore #3008 | acted as evidence custodian |
| CPL J Sutherland 343<br>OFC C Brady 2687<br>OFC E Chavez 3520<br>OFC C Gray 3855<br>OFC W Snow 3450<br>OFC J Ricks 3484<br>OFC S Tabor 3662<br>OFC J Romero 3648 | members of Central ZT team, which served subject warrant |
| Officer GD Sprout 3290 | confirmed warrants of arrestees |

**Defs. Resp. Mtn Exclude App.  5**

| Sgt RE Johnson 2478<br>AD Taylor #3604<br>J Sandoval 3625<br>CM Jones 3767<br>CM Gilmore 3008<br>JE Bell 3816<br>NB Danford | narcotics officers who searched scene |
|---|---|
| Detective D.G. Rohloff #2522<br>D.L. BAGGOTT, ID 2186<br>Det. Murtaugh | worked on CPI investigation of subject incident |
| Officer M. Kaether, ID #3893<br>Officer A. Brewer, ID #3979 | present at scene and were at hospital with Jermaine Darden after incident |
| Officer Campbell | at hospital with Jermaine Darden after incident |
| Officer Jeannes | CSSU officers who collected evidence after incident |
| Lt. Verrett | may have responded to scene |

Based each of these officer's years' of experience as a police officer, his or her firsthand memory of the facts from the incident in question or the investigation thereof (see notes above), and his or her review of the available video footage of the incident in question and the other case documents in the critical police incident report package, each officer is expected to testify as to the reasonableness of the actions at all relevant times of the police officer defendants herein, including that the officers acted reasonably at all times during their entry into the home and service of the warrant and their interaction with Jermaine Darden and that the defendant officers violated none of Plaintiffs' or Jermaine Darden's clearly established rights. The witnesses are expected to testify that the force used by each officer at all relevant times was reasonable and not violative of any person's clearly established rights. The witnesses are further expected to testify that the defendant officers acted in reasonable reliance on the information provided them by fellow officers and in reliance

**Defs. Resp. Mtn Exclude App.  6**

on the probable cause found by an independent magistrate to serve the warrant. The witness is expected to testify that the force used, including the actions that led to Plaintiff being on the ground, exposed to a Taser, and handcuffed was reasonable and that the injury or illness suffered by Jermaine Darden was not the result of any excessive use of force or any other alleged improper action or inaction by defendants.

4.      Officer Jamie Johnson. Officer Johnson can be reached through Laetitia Coleman Brown, Attorney for Defendant City of Fort Worth, Laetitia Coleman Brown, Fort Worth City Attorney's Office, 1000 Throckmorton St., Fort Worth, Texas 76102, 817-392-6639. Otherwise, his work address generally is Fort Worth Police Department, 350 West Belknap Street Fort Worth, Texas 76102, (817) 392-4000.

Based on his years' of experience as a police officer and as an instructor of police officers and his review of the available video footage of the incident in question and the other case documents in the critical police incident report package, this officer is expected to testify as to the reasonableness of the actions at all relevant times of the police officer defendants herein, including that the officers acted reasonably at all times during their entry into the home and service of the warrant and their interaction with Jermaine Darden and that the defendant officers violated none of Plaintiffs' or Jermaine Darden's clearly established rights. The witness is expected to testify that the force used by each officer at all relevant times was reasonable and not violative of any person's clearly established rights. The witness is further expected to testify that the defendant officers acted in reasonable reliance on the information provided them by fellow officers and in reliance on the probable cause found by an independent magistrate to serve the warrant. The witness is expected to testify that the force used, including the actions that led to Plaintiff being on the ground, exposed to

**Defs. Resp. Mtn Exclude App.  7**

a Taser , and handcuffed was reasonable and that the injury or illness suffered by Jermaine Darden

was not the result of any excessive use of force or any other alleged improper action or inaction by

defendants.

5.      Tarrant County Medical Examiner, personnel and custodians of records, including:

Lloyd White, M.D., Ph.D., former Deputy Medical Examiner (current contact
information unknown to Defendants)
Tasha Z. Greenberg, M.D., Deputy Medical Examiner
Nizam Peerwani, M.D., DABFP , Chief Medical Examiner
Robert Johnson, PH.D., DABFT, Chief Toxicologist
Kyle Finney, Medical Investigator
Michael Floyd, Chief Forensic Death Investigator

Office of Chief Medical Examiner
Tarrant County Medical Examiner's District
Tarrant County, Texas
200 Feliks Gwozdz Place, Fort Worth, Texas 76104-4919
(817) 920-5700 FAX (817) 920-5713

Each of these witnesses is expected to testify consistent with the opinions contained in the

autopsy report of Jermaine Darden (enclosed herewith) and based on their review of the information

contained therein and known to them at the time or shortly after the autopsy was performed.

6.      All of Plaintiff's past or present medical providers and custodians of records thereof.

Defendants do not have access to these witnesses and do not know their opinions beyond what is in

their respective records, if any.  Defendants may call any of these providers in rebuttal to Plaintiff's

and his experts' claims.

Respectfully submitted,

Kenneth E. East
State Bar No. 00790622

**Defs. Resp. Mtn Exclude App.  8**

FOSTER & EAST
9001 Airport Freeway, Suite 675
North Richland Hills, Texas 76180
(817) 788-1111
Fax: (817) 485-2836
ken1@airmail.net

ATTORNEY FOR DEFENDANT
W.F. SNOW

D. Lee Thomas, Jr.
State Bar No. 19847500
507 West Central Avenue
Fort Worth, Texas 76164-9135
Tel: 817-625-8866
Fax: 817-625-8950
dlthom31@yahoo.com

ATTORNEY FOR DEFENDANT
J. ROMERO


## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2016, I served a copy of this document on the following parties or their counsel of record:

DARYL K. WASHINGTON
LAW OFFICE OF DARYL K.
WASHINGTON, P.C.
325 N. St. Paul St., Suite 1975
Dallas, Texas 75201
214 880-4883
214-751-6685 - fax
dwashington@dwashlawfirm.com
legalassistant@dwashlawfirm.com, and
matt@mattkita.com

via email and U.S. First Class Mail

Laetitia Coleman Brown
Assistant City Attorney
1000 Throckmorton Street
Fort Worth, Texas 76102
817-392-7600
817-392-8359 fax
laetitia.brown@fortworthtexas.gov
victoria.honey@fortworthtexas.gov
via email

DEFENDANT W.F SNOW and J. ROMERO'S DISCLOSURE OF EXPERTS                    PAGE 8

**Defs. Resp. Mtn Exclude App.  9**

D. Lee Thomas, Jr.
507 W. Central Avenue
Fort Worth, Texas 76164
817-625-8866
817-625-8950 fax
dlthom31@yahoo.com
renee.dolkos@gmail.com

via email

_____
Kenneth E. East

DEFENDANT W.F SNOW and J. ROMERO'S DISCLOSURE OF EXPERTS                PAGE 9

**Defs. Resp. Mtn Exclude App.  10**

Tasha Zemrus Greenberg, M.D. PA

May 3, 2016

Kenneth E. East
FOSTER & EAST
Attorneys at Law
9001 Airport Freeway, Suite 675
North Richland Hills, Texas 76180

Dear Mr. East,

Per your request, in the matter of ERIC C. DARDEN, as Administrator of the Estate of Jermaine
Darden v. The City of Fort Worth, Texas, et al., Civil Action No. 4:15-CV-221-A, in the United States
District Court, Northern District of Texas, Fort Worth Division, I have agreed to serve as an expert in this
matter.

I am currently employed as a Deputy Medical Examiner at the Tarrant County Medical
Examiner's Office (TCME) in Fort Worth, Texas and have worked here since September of 2012. My
educational background includes receipt of a Bachelor's of Science degree in Kinesiology from the
University of California at Los Angeles in 1989, receipt of a Medical Degree from Baylor College of
Medicine in 1996 and completion of one year of Pathology residency at St. Joseph's Hospital and
Medical Center in Phoenix, Arizona and four additional years at Baylor College of Medicine in Houston,
Texas ending in 2001. I then completed a fellowship in Forensic Pathology at the Office of the Medical
Examiner for the County of Cook in Chicago, Illinois in 2002 and began working as an Assistant Medical
Examiner for the Office of the Chief Medical Examiner for the State of Maryland in Baltimore, Maryland
until 2008. I then worked as the Medical Director for Autopsy Services at Parkland Hospital for the
University of Texas Southwestern Medical Center in Dallas, Texas for three years where I supervised and
taught residents in Pathology during their autopsy rotations. I am board certified in Anatomic and
Forensic Pathology, and currently hold a medical license in the State of Texas. During my training and
employment, I have performed approximately three thousand autopsies and observed or supervised
many more.

In 2013, I was asked to review and complete the report on an autopsy that had been performed
at the TCME's office on May 17, 2013. The examination had been performed by Dr. Lloyd White prior to
his retirement. To this end, I reviewed all relevant and available materials, including notes, microscopic
slides, investigative information, toxicology results, photographs, Taser device report and incident
videos. This information was then presented at the TCME Critical Case Review on 8/21/2013 and
8/28/2013, and a consensus opinion of those medical examiners present was obtained regarding cause
and manner of death. These items were re-reviewed at the present time along with provided medical
records.

109 Dickens Drive     tashagreenberg@gmail.com
Coppell, TX 75019
214-307-6543

-2-

The circumstances of this incident are that the decedent, Jermaine N. Darden, identified by TCME case number 1306402, with a date of birth of 7/24/1978 was involved in a physical struggle with police while a search warrant was served, during which time a Taser was deployed and he was physically restrained. The beginning of the struggle could be heard on audio of a body cam tape (GOPRO018) at approximately 1:28 time of video. A faint possible statement of "can't breathe" is heard around this time, though it is not possible to ascertain who made this statement.

The Taser was deployed at approximately 1:47 video time with a second deployment at approximately 2:02 video time, and he was seen on his back at 2:09. Review of the Taser printout verified deployment of the Taser for 5 seconds each at 16:14:51 and 16:15:07. Mr. Darden continued to struggle and was rolled over on his side, then onto his stomach and was held down while being handcuffed. During this time, movement of his head was identified. Once he was handcuffed, officers stepped away from him and then rolled him over and assisted him to a seated position out of expressed concern for his ability to breathe. He was seated unassisted briefly, then an officer is noted to stabilize him from behind. It is uncertain at what exact point he became unresponsive.

Per EMS records, first vitals were taken at 4:47:23. At this time, there was no heart rate, no respirations and no blood pressure with a glascow coma scale of 3 and asystole by EKG. CPR was performed and he was transported to the hospital; epinephrine and narcan were noted to have been administered along with normal saline. He arrived at the emergency department at 1701. Bedside sonogram showed no cardiac activity. He was pronounced dead at 1709. Medical records did not note any past medical history on file, however there was one ER visit in June of 2012 following a motorcycle collision with no significant injuries noted. Family members report a history of asthma and hypertension, though this is not substantiated by medical records.

Autopsy findings included features of hypertensive atherosclerotic cardiovascular disease with focally severe coronary atherosclerosis including greater than 90% stenosis of the left anterior descending coronary artery and concentric left ventricular hypertrophy. The heart weighed 477 grams, which is slightly enlarged based on predicted normal weights for height. Mr. Darden was also obese with a body mass index of 52. Toxicology testing was positive for XLR-11, a synthetic cannabinoid, in the aortic blood, but was negative for ethanol and other drugs. Histologic examination of the organs showed features consistent with gross observations in the heart and lungs, with hypertrophic or enlarged cardiac myocytes, severe coronary atherosclerosis, pulmonary congestion and edema, as well as identifying hepatic steatosis or fatty change and chronic thyroiditis or inflammation in the thyroid gland. There were no features of an acute asthmatic episode identified in the lungs, which would be characterized by eosinophilic inflammation and mucus in airways.

The cause of death was ruled as sudden cardiac death associated with hypertensive atherosclerotic cardiovascular disease and application of restraint, with obesity, hepatic steatosis and chronic thyroiditis noted as contributory conditions. The manner of death was ruled as natural.

-3-

Sudden cardiac death (SCD) is a sudden, unexpected death caused by loss of heart function (sudden cardiac arrest). There are many risk factors that can increase a person's risk of sudden cardiac arrest and sudden cardiac death, including coronary artery disease, hypertension, previous myocardial infarction or heart attack, high cholesterol, family history of heart disease, smoking, obesity and recreational drug use. Activation of the sympathetic nervous system leads to accelerated heart rate, constriction of blood vessels and elevated blood pressure. Therefore, physiologic stress, such as exercise or other form of physical exertion, can trigger a life-threatening arrhythmia as well. In over half of cases, sudden cardiac arrest occurs without symptoms.

XLR-11, (1-(5-fluoropentyl)-1H-indol-3-yl) (2,2,3,3-tetramethylcyclopropyl) methanone, also known as 5-fluoro UR-144 or 5-FUR-144, is a synthetic cannabinoid, designed to mimic the agonistic effects attributed to tetrahydrocannabinol (THC) in the human system. It has been reported that the toxicity of synthetic cannabinoid, however, may be greater than THC due to higher potency, unregulated and varied dose preparation and purity on the vegetable matter and stronger activity on the cannabinoid receptors. There have been significant toxicological findings attributed to synthetic cannabinoid exposure that have not been seen with typical recreational marijuana usage, including acute nephrotoxicity, adverse psychoactive responses including severe anxiety, psychosis and hallucination, tachycardia or rapid heart rate, myocardial infarction, respiratory depression, seizures, suicidal ideations and death. The contribution of the XLR-11 synthetic cannabinoid to death in this case is uncertain.

In summary, this patient had multiple risk factors for sudden cardiac death, including severe coronary stenosis due to atherosclerosis, hypertrophy of the left side of the heart with cardiomegaly, obesity, fatty liver and thyroiditis, as well as use of a potentially cardiotoxic synthetic cannabinoid drug. The severity of his cardiac disease alone made him susceptible to sudden cardiac death at any time, with or without physical exertion. In this case, he became unresponsive associated with physical exertion during a struggle and physical restraint by the police.

Please contact me with any questions or concerns regarding this matter.

Sincerely,

Tasha Z. Greenberg, M.D.

**Defs. Resp. Mtn Exclude App.  13**

# Tasha Zemrus Greenberg, M.D.
200 Feliks Gwozdz Pl, Fort Worth TX 76104
Office (817) 920-5700 x 8364
Fax (817) 920-5713
nce_tzgreenberg@tarrantcounty.com

**Current Position:**

| | |
|---|---|
| Deputy Medical Examiner | Tarrant County Medical Examiner's Office (TCME), Fort Worth, TX; 2012 – Present |

**Committee and Other Appointments, TCME:**

Faculty Supervisor for Postgraduate Education
Graduate Medical Education Committee
Safety Committee
NAME Accreditation Committee
Child Fatality Review Committee

**Previous Positions:**

| | |
|---|---|
| Medical Director of Autopsy Service | The University of Texas Southwestern Medical Center (Dallas, TX); 2009-2012 |
| Assistant Professor | The University of Texas Southwestern Medical Center, Department of Pathology (Dallas, TX); 2009-2012 |
| Assistant Medical Examiner | Office of the Chief Medical Examiner, State of Maryland: 2002-2008 |
| Vice Chairman | Maryland State Child Fatality Review Team: 2007-2008 |
| Clinical Instructor | University of Maryland Medical Center, Department of Pathology (Baltimore, MD); 2002-2008 |
| Lecturer in Pathology | Johns Hopkins School of Medicine, Department of Pathology (Baltimore, MD); 2007–2008 |

**Certification:**

| | |
|---|---|
| Texas State License | N3696, issued 2009 |
| Diplomate | The American Board of Pathology: Anatomic Pathology, 2002
The American Board of Pathology: Forensic Pathology, 2003 |

**Education and Training:**

| | |
|---|---|
| Undergraduate: | University of California (Los Angeles, CA); 1984-1989
B.S. (Kinesiology) |
| Graduate: | Northwestern University, Institute for Neuroscience (Evanston, IL); 1990-1992 |
| Medical School: | Baylor College of Medicine (Houston, TX); 1992-1996
M.D. |
| Residency: | St. Joseph's Hospital and Medical Center (Phoenix, AZ); 1996-1997
Anatomic and Clinical Pathology

Baylor College of Medicine (Houston, TX); 1997-2000
Anatomic and Clinical Pathology |

**Defs. Resp. Mtn Exclude App. 14**

Tasha Zemrus Greenberg, M.D.                                                      Page 2

| | |
|---|---|
| Residency (cont.): | Texas Children's Hospital (Houston, TX); 2000-2001<br>Pediatric Pathology |
| Fellowship: | Office of the Medical Examiner, County of Cook (Chicago, IL); 2001-2002<br>Forensic Pathology |

**Professional Societies:**

| | |
|---|---|
| Fellow | American Academy of Forensic Sciences |
| Member | National Association of Medical Examiners |
| Member | Texas Medical Association |
| Member | Tarrant County Medical Society |
| Member | Tarrant Academy of Medicine |

**Educational Activities:**

*Classroom Instruction:*
Pathology Laboratory for Medical Students, UT Southwestern (Dallas, TX); 2010-2012

Pathology Laboratory for Medical Students, Johns Hopkins Hospital (Baltimore, MD); 2007-2008

Pathology Laboratory for Medical Students, University of Maryland (Baltimore, MD); 2003-2007

Pathology Laboratory for Medical Students, Baylor College of Medicine (Houston, TX); 1997-2001

Undergraduate Neuroanatomy Laboratory, Northwestern University (Evanston, IL); 1990-1992

Undergraduate Biology Laboratory, Northwestern University (Evanston, IL); 1990-1992

Undergraduate Gross Anatomy Laboratory, University of California (Los Angeles, CA); 1987-1988

*Clinical Instruction:*
Forensic Pathology Core Curriculum, Office of the Chief Medical Examiner (Baltimore, MD); 2002 – 2008

*Invited Talks:*
"Pediatric Death Investigations". Current Trends in Forensic Pathology: Current Trends in Forensic Science Where There's Smoke... Investigating Fire Related Deaths (Fort Worth, TX); 2015.

"Adolescent Deaths in Maryland". State Child Fatality Review Annual Training Meeting (Hanover, MD); 2007.

"Maryland Child Death Investigation: Changing trends in SIDS and SUDI". State Child Fatality Review Annual Training Meeting (Baltimore, MD); 2006.

"Child Death Investigation". Governor's Conference on Child Abuse & Neglect (Baltimore, MD); 2004.

"Child Death Investigation". Every Child Counts Conference (Baltimore, MD); 2004.

"Pediatric Death Investigation". Medicolegal Death Investigation course for Criminal Justice Majors, University of Baltimore (Baltimore, MD); 2003.

"Pediatric Death Investigation". Harvard Associates in Police Science Seminar in Homicide Investigation (Baltimore, MD); Biannually, 2003–2005.

"Sharp Force Injuries". Forensic Pathology Course, Northwestern University (Evanston, IL); 2002.

"Introduction to Forensic Pathology". Pathology Lecture Series for Medical Students, Baylor College of Medicine (Houston, TX); 2001.

**Defs. Resp. Mtn Exclude App.   15**

Tasha Zemrus Greenberg, M.D.                                                                         Page 3

*Invited Talks, (cont.):*

"Forensic Medicine. Combined Program for Medical Technology Education, Baylor College of Medicine (Houston, TX);
1999 & 2000.

**Research Activities:**

*Presentations:*

Mautone A, Fries R, **Greenberg T**, Peerwani N If at First You Don't Succeed. American Academy of Forensic
Sciences 68th Annual Meeting, February 2016. Platform Presentation (H62).

**Greenberg T**, Roe S, Stephen D, Peerwani N Fatal Aortoesophageal Fistulae Due to Foreign Body Ingestion in
Young Children: Presentation of two cases. American Academy of Forensic Sciences 67th Annual Meeting,
February 2015. Platform Presentation (H45).

Segovia A, **Greenberg T**, Golden K An Uncommon Cause of Pulmonary Embolism. American Academy of
Forensic Sciences 67th Annual Meeting, February 2015. Platform Presentation (H144).

**Greenberg T**, Stephany, J, Fowler, D Two Cases of Industrial Mulch Spreader/Bark Blower Fatalities in Maryland &
Florida: Description & Investigation by NIOSH Fatality Assessment & Control Evaluation (FACE). National Association
of Medical Examiners Annual Meeting, October 2007, Poster Session.

**Greenberg T**, Zulauf D, Fowler D Compressional Asphyxia of a Two Year Old by a Dresser: Autopsy, Investigation
and Legal Disposition. National Association of Medical Examiners, 2007 Annual Meeting, October 2007, Poster Session.

Chu A, Allan C, **Greenberg T**, Ripple M, Fowler D. Fatal infant dog maulings associated with infant swings. American
Academy of Forensic Sciences 57th Annual Meeting, February 2005. Poster Session.

**Greenberg T**, Fowler D. Fourteen pregnancy-related deaths examined at the Office of the Chief Medical Examiner, State
of Maryland, in 2003. American Academy of Forensic Sciences, 56th Annual Meeting, February 2004, Poster Session.

Burke A, Mont E, **Zemrus T**, Pearse L, Fowler D, Virmani R. A Series of 16 Deaths in Men and Women Using
Anorexigens. National Association of Medical Examiners, Annual Meeting, September, 2003, Poster Session.

**Zemrus T**, Segovia A. Sudden Asphyxial Death Due to Regurgitation of a Pedunculated Esophageal Lipoma: A Case
Report and Review of the Literature. American Academy of Forensic Sciences, 55th Annual Meeting, February 2003,
Poster Session.

**Zemrus T**, Shrode P. A Revised Approach to Death in Custody. American Academy of Forensic Sciences, 51st Annual
Meeting, February 1999, Poster Session.

**Zemrus T**, Wiley K, Gondo M, Khan S, Carlson N, Cagle P. Simian Virus 40 (SV40) and p53 Detection by
Immunostaining and PCR in Human Bronchioloalveolar (BACA) Carcinomas. Federation for Advancement of
Science & Experimental Biology Meeting, April 1998, Poster Session.

**Zemrus T**, Gondo M, Wiley K, Cagle T. Immunodetection of Simian Virus 40 (SV40) in Human Pulmonary
Adenocarcinoma. United States and Canadian Academy of Pathology 87th Annual Meeting, March, 1998 and
Texas Society of Pathologists 77th Annual Meeting (Second Place Award), February 1998, Poster Session.

**Zemrus T**, Anton R, Barrios R, Habib G, Seaver S, Wiley K, Gondo M, Carlson N, King M, Cagle P. Expression of
SV40 Large T Antigen (Tag) in 141 Human Malignant Mesotheliomas (MM): A Possible Etiologic Role? Federation
for Advancement of Science & Experimental Biology '98 Meeting, April 1998, Platform Presentation.

*Publications:*

Navalkele DD[1], Georgescu MM, Burns DK, **Greenberg T** Vernino S Progressive leg pain and weakness.
JAMA Neurol. 2013 Apr;70(4):510-4. doi: 10.1001/jamaneurol.2013.2158.

Moore K, **Zemrus T**, Ramcharitar V, Levine B, Fowler D. Mixed Drug Intoxication Involving Zaleplon ("Sonata").
Forensic Science International, 134: 120-122, 2003.

**Defs. Resp. Mtn Exclude App.  16**

**Dr. Greenberg – Court Appearances 2014**

1305638 and 1305637 (Tarrant) – Roxann Sanchez and Anthony Figuero - Trial 5/6/2014

1301193 (Tarrant) – John Raidy  - Trial 8/19/2014

1306452 (Tarrant) – Juliana Payan  Trial 7/10/2014

1308725 (Midland) – Kyara West - Trial 9/17/2014

1403355 – (Tarrant) - Joselyn Saucedo - Trial 10/17/14

1309245 (Tarrant) – Alton Alexander – Trial in Palo Pinto Co. 10/9/2014

DR. GREENBERG COURT APPEARANCES 2015-PRESENT

| DATE | CASE(S) | COUNTY, COURT, DA, INVESTIGATOR |
|------|---------|--------------------------------|
| 2/6/15: | 1109021 | Taylor County |
| 4/8/15: | 1406582 | Midland County |
| 4/15/15: | 1312096 | Tarrant County |
| 5/13/15: | 1311055 | Tarrant County |
| 6/8/15: | 1406276 | Denton County |
| 6/24/15: | 1401510 | Tarrant County |
| 8/20/15: | 1503545 1503547 1503544 | Johnson County, DA Matt Smyd |
| 8/21/15: | Same as above (sentencing phase) | |
| 9/8/15: | 1310159 | Johnson County |
| 9/23/15: | 1502083 | Parker County Grand Jury |
| 11/18/15: | 1407998 | Taylor County, 350th DC, DA Dan Joiner, Inv. Larry Tatum |
| 12/8/15: | 1505354 | Deposition, Bryce Cottongame |
| 12/10/15: | 1416383 | Tarrant County, CDC1, DA Lloyd Whelchel, Judge Elizabeth Beach |
| 2/4/16: | 1415852 | TCDA Carl Lazarus, Juvenile Justice Center |
| 3/22/16: | 1311286 | TCDA Bill Vassar & Vincent Giardino, CDC2, Judge Roger Towery Decedent Tommy Lee Brown |
| 4/26/16 | 1306650 | USDA Joshua Burgess & Aisha Saleem, USDC Judge Terry Means |

**Defs. Resp. Mtn Exclude App.  17**

# Tasha Zemrus Greenberg, M.D. PA

To whom it may concern:

Thank you for the opportunity to work with you on this case. My professional charges are as follows:

| TYPE OF WORK | HOURLY FEE |
|---|---|
| Preparation/Meetings | $295 |
| Travel | $135 |
| Testimony | $550 |
| Deposition | $650 |

At this time, I would request a retainer of $2500, payable to Tasha Zemrus Greenberg, M.D. PA at the address below.

Sincerely,

Tasha Zemrus Greenberg, M.D.

Federal Tax ID No.: 46-0843278

# EXHIBIT B

Defs. Resp. Mtn Exclude App.   19



Office of Chief Medical Examiner
Tarrant County Medical Examiner's District
Tarrant County, Texas
200 Feliks Gwozdz Place, Fort Worth, Texas 76104-4919
(817) 920-5700  FAX (817) 920-5713

# AUTOPSY REPORT

**Name:** Jermaine N. Darden                    **CASE NO:** 1306402
**Approximate Age:** 34 Years                   **Sex:** Male
**Height:** 68 Inches                           **Weight:** 340 Pounds

I hereby certify that on the 17th day of May 2013, beginning at 1111 hours, I, Lloyd White, M.D., Ph.D., pursuant to Statute 49.25 of Texas Criminal Code, performed a complete autopsy on the body of Jermaine N. Darden at the Tarrant County Medical Examiner's District Morgue in Fort Worth, Texas and upon investigation of the essential facts concerning the circumstances of the death and history of the case as known to me, I am of the opinion that the findings, cause and manner of death are as follows:

**FINDINGS:**

I) Investigative findings:

    A. Subject engaged in physical struggle with police after failing to comply with instructions during search warrant.

    B. Taser deployed x 2 for 5-second duration each, on 5/16/2013 at 16:14:51 and 16:15:07. Device report for Model #TASER_ECD_x2, Serial #X29000FPP was reviewed.

    C. Video of incident reviewed at Critical Case Review on 8/21/2013 that showed physical struggle during which subject was tased x 2 and continued to struggle with police. He was subsequently handcuffed while in a prone position and was then placed into a seated position with his hands behind his back. At this point, he was noted to be alert and breathing on the video.

    D. At this point, it was reported to TCME investigators that the subject stated that he had asthma and was experiencing shortness of breath. He subsequently became unresponsive and resuscitative efforts were initiated.

    E. The subject arrived in the emergency department at 1701; the code started at 1707, ending at 1709 when he was pronounced dead. Narcan and Epinephrine were administered.

    F. Hospital notes indicated that the subject became unresponsive during the second Taser deployment; however, review of the videotaped incident does not support this statement.



EXHIBIT
Def Resp

Mtn Exclude App.  20

ME O      1306402
Jermaine N. Darden

II)   Autopsy findings:
    A.  Hypertensive atherosclerotic cardiovascular disease
        1)  Focally severe atherosclerosis with 90% stenosis of left
            anterior descending coronary artery
        2)  Concentric left ventricular hypertrophy (2.8 cm); borderline
            right ventricular hypertrophy
        3)  Cardiac weight 477 gms (expected 479 +/-60 gms for weight,
            316 (upper limit 446) gms for height)
    B.  Pulmonary congestion and edema, patchy; no acute or chronic
        asthmatic changes; focal early acute pneumonia; hemosiderin-laden
        macrophages
    C.  Hepatic steatosis, marked, with mild portal chronic inflammation
    D.  Brain with perivascular hemosiderin deposition
    E.  Diffuse chronic thyroiditis
    F.  Superficial contusion of right forehead; abrasions (2) of back
III)  Toxicology: Positive for XLR-11 (synthetic cannabinoid) in aortic blood;
      negative for ethanol or other drugs

**Defs. Resp. Mtn Exclude App.   21**

Page 3 of 9.                                                  1306402
                                                      Jermaine N. Darden

**CAUSE OF DEATH:**
I)      SUDDEN CARDIAC DEATH ASSOCIATED WITH HYPERTENSIVE
        ATHEROSCLEROTIC CARDIOVASCULAR DISEASE AND
        APPLICATION OF RESTRAINT
II)     OBESITY, HEPATIC STEATOSIS; CHRONIC THYROIDITIS

**MANNER OF DEATH:   NATURAL**

COMMENT:  This case was presented at Critical Case Review on 8/21/2013 and 8/28/2013, and a consensus opinion was obtained regarding cause and manner of death.  Available information regarding the incident was reviewed, along with autopsy findings and video of the incident itself.  Autopsy findings are significant for an obese male with severe cardiovascular disease, chronic thyroiditis, and hepatic steatosis.  There is no significant injury of the head or torso, and no injury of the anterior neck identified.  Toxicology examination reveals the presence of a synthetic cannabinoid in the blood, XLR-11.  Review of video of the incident reveals that there was a struggle with police when the subject was noncompliant with instructions, during which he was tased twice and held in a prone position on the ground while being handcuffed.  Following this, he was placed in a seated position; at this time, he was awake; however, subsequently became unresponsive.  There was no direct contribution of Taser deployment in his death.  The significance of the synthetic cannabinoid is uncertain; however, as a group they are potentially cardiotoxic, particularly in the presence of significant underlying heart disease.

_____          Tasha Z. Greenberg, M.D.
Signature                                *Deputy Medical Examiner*

Page 4 of 9

1306402
Jermaine N. Darden

A complete autopsy is carried out at the Tarrant County Medical Examiner's Morgue.

## GROSS ANATOMIC DESCRIPTION

I.   **CLOTHING AND PERSONAL EFFECTS:**   The body is received in the autopsy room in a white vinyl remains removal pouch, and is dressed only in green boxer shorts. There is no jewelry.

II.   **THERAPEUTIC INTERVENTION:**   Evidence of medical treatment includes an oral endotracheal tube, and a left tibial needle.

III.   **EXTERNAL BODY DESCRIPTION:**

The body is presumptively identified by ankle band and is that of an obese, dark brown complexioned, conventionally black man, 68 inches in stature, weighing 340 pounds, and appearing the stated age of 34 years. Rigor is complete but livor is not visible due to the dark complexion. Up to 1/8 inch in length, scalp hair is black and tightly curly (male pattern baldness is present) with a 1/8 inch in length mustache and ¼ inch beard. Irides are brown, pupils are 4 mm in diameter and equal, and teeth are natural and in good condition. External ears and ear canals are normal, nares are patent, and the nasal septum is intact. Both earlobes are pierced. There are no fractures, amputations, or congenital malformations of upper or lower extremities. External genitalia are those of a normally developed man. There is an irregular, ½-inch contusion of the upper right forehead, there is a round, 3/16 inch diameter superficial abrasion of the left posterior chest just below the scapula, and there is a similar circular 3/16 inch abrasion in the midline over the lower thoracic spine. Thorough examination of the body surface, including the back, reveals no additional evidence of injury.

There is a 2 inch midsagittal linear scar over the lumbar spine, there are numerous irregular, no more than ¼ inch scars over the anterior surfaces of both legs, there are a few similar circular scars on the anterior abdomen and medial bilateral thighs, and there is a single, round ¼ inch scar near the center of the dorsal surface of the left hand. Around the right arm and forearm, there is a complex tattoo design, which includes birds, dollar signs, bundles of paper money, the face of a pig, and illegible lettering. Around the left arm and forearm,

**Defs. Resp. Mtn Exclude App.  23**

A1306402
Jermaine N. Darden

there is a complex tattoo design, which includes flames, a star, "Texas Made", "OUTLAW 36", and _____ 996, 1999".

## IV.   INTERNAL EXAMINATION:

### BODY WALL AND SEROUS CAVITIES:

The neck, chest, and abdomen are opened by means of a standard Y-shaped incision. Viscera are examined *in situ* then removed for dissection according to the method of Virchow. Thoracic and abdominal walls are intact and normally developed, with a 2-1/2 inch anterior abdominal *panniculus adiposus*. Normally distributed subcutaneous fat tissue is moist and bright yellow. Pleural, pericardial, and peritoneal cavities are lined by smooth, blue-purple membranes without adhesions, and all contain normal quantities of transparent, pale yellow serous fluid. Soft tissues of the mediastinum, retroperitoneum, omentum, and mesenteries are grossly normal. No hemorrhage or other signs of injury are present.

### NECK ORGANS

Bones and cartilages of the larynx and cervical spine are intact, as is the hyoid bone, on palpation and direct gross visualization. On dissection of the soft tissues of the neck, no hemorrhage, or other gross evidence of injury or natural disease are demonstrated.

### CARDIOVASCULAR SYSTEM

The heart weighs 447 gms and the epicardium and endocardium are grossly normal. There is greater than 90% stenosis of the proximal anterior intraventricular artery, with no more than 10% stenosis of the circumflex and right coronary arteries by soft atheromatous plaque. Left and right ventricular walls are symmetrically hypertrophied, the left 2.8 cm in thickness and the right 0.5 cm. Cut surfaces of the myocardium are everywhere uniform and dark brown, without scars or other grossly discrete lesions. Valve cusps are soft and pliable, with minimal atheromatous changes and no anatomical stenosis or insufficiency. There are mild depositions of atheromatous plaque without calcification on the aortic intima, and ostia of major branches are widely patent. The great veins are normal throughout:

**Defs. Resp. Mtn Exclude App.   24**

Page 6 of 9

1306402
Jermaine N. Darden

## RESPIRATORY TRACT

The left lung weighs 521 gms and the right 764 gms. Airways are patent, containing no foreign objects or material, and the mucosa is covered by abundant, somewhat frothy, pale gray mucus. Both lungs are firm, non-crepitant, and somewhat boggy in consistency, with smooth, shiny dark blue-purple external surfaces, and moist dark red-purple cut surfaces, which ooze frothy, thin dark gray or red-purple fluid on sectioning. Anthracosis is moderate. Wide dissection of the parenchyma reveals no cysts, masses, granulomas, or other grossly discrete lesions of natural disease.

## GASTROINTESTINAL TRACT

The gastric lumen contains approximately four, no more than 1 inch in dimension, pieces of partly digested meat. The mucosa and wall of the esophagus and stomach are normal in appearance. External examination of the small bowel and colon reveals no hemorrhage, masses, or other evidence of injury or natural disease, and the vermiform appendix is grossly normal.

## MAJOR DIGESTIVE ORGANS

The pancreas is soft and uniformly pale brown, dissection revealing no masses, hemorrhage, or other grossly discrete abnormalities.

The liver weighs 3289 gms, with a blue-purple capsule, and a uniform dark brown cut surface. Wide dissection reveals no cysts, masses, or other grossly discrete lesions of natural disease, and the parenchyma is normal in consistency. The gallbladder contains an estimated 10 mL of dark yellow-green bile without stones, and the extrahepatic biliary tract is patent and grossly normal.

## LYMPHORETICULAR SYSTEM

The spleen weighs 179 gms, with a dark blue-purple capsule and a firm, uniformly dark red-purple cut surface without scars, infarcts, or other grossly discrete abnormalities of natural disease. There is no lymphadenopathy, and spinal bone marrow is normal in appearance. The thymus is involuted.

## ENDOCRINE ORGANS

The pituitary, thyroid, parathyroids, and suprarenals are grossly normal.

1306402
Jermaine N. Darden

## URINARY TRACT

The left kidney weighs 229 gms and the right 211 gms. Capsules strip easily to reveal smooth, brown external surfaces. Cut surface architecture is normal, there being no cysts, masses, or other grossly discrete pathologic lesions. Pelves and ureters are patent and normal in appearance. The urinary bladder contains an estimated 5 mL of pale yellow, transparent urine, and the mucosa and wall are grossly normal.

## REPRODUCTIVE ORGANS

Both testes are palpable in the scrotum, without masses, injury, or deformity and the prostate and seminal vesicles are grossly unremarkable for a man of this age.

## CRANIUM AND CENTRAL NERVOUS SYSTEM

A craniotomy and removal of the brain are carried out through a coronal mastoid-to-mastoid incision of the scalp, reflection of which reveals a right frontal contusion, which has been previously noted. The calvarium is intact and normal in configuration. The dura is normal in appearance and the leptomeninges are transparent and grossly normal. There are no abnormalities of vessels at the base of the brain. The brain weighs 1403 gms, with a normal gyral pattern. Multiple transverse sections of brainstem and cerebellum, together with coronal sections of the cerebral hemispheres, reveal no cysts, masses, hemorrhage, or other gross evidence of injury or natural disease. On stripping of the dura, the base of the skull is intact and normal in configuration.

The spinal cord is not examined.

1306402
Jermaine N. Darden

## SPECIMENS AND EVIDENCE COLLECTED

1. 30 mL of aortic blood, 30 mL of femoral blood, 5 mL of urine, and 5 mL of vitreous humor for possible further examination
2. Representative tissue samples preserved in formalin for possible further examination
3. Two tissue cassettes for microscopic examination
4. One blood card
5. Representative photographs

EDC: 8/16/13
Dictated: 5/17/13
Transcribed: 5/20/13
Completed: 8/28/13
LW:caa

**Defs. Resp. Mtn Exclude App.  27**

1306402
Jermaine N. Darden

## HISTOLOGY

**HEART:** Mildly hypertrophic myocytes, small vessel disease with medial hypertrophy, increased perivascular fibrosis. Coronary artery sections show 75-90% stenosis by atherosclerotic plaque.

**LUNGS:** Patchy edema, hemosiderin-laden macrophages in alveoli, congestion; no mucus plugging or eosinophilic infiltrate noted to suggest acute asthmatic changes; no significant muscular or glandular hypertrophy noted to suggest chronic asthmatic changes; small focus of acute neutrophilic infiltration in alveoli; occasional platelet thrombi.

**LIVER:** Diffuse, prominent centrilobular steatosis, primarily macrovesicular; minimal portal chronic inflammation with focal spillover.

**THYROID:** Diffuse lymphocytic infiltrate with fibrosis-forming nodules; no Hürthle cell proliferation.
**BRAIN:** Perivascular hemosiderin deposition.

**KIDNEY:** Autolysis, medullary congestion.

**HILAR LYMPH NODE:** Anthracosis.

Trachea, spleen, stomach, pancreas, colon, adrenal gland, skeletal muscle — no significant histopathologic change.

## Office of Chief Medical Examiner

MB-18A-GPC-1953 Rev. 7/06

Tarrant, Denton and Parker Counties, Texas

200 Feliks Gwozdz Place, Fort Worth, Texas 76104-4919 ❖ (817) 920-5700

Examiner: Krinfer-Caa          Autopsy No. 1/306 402



1/2" jugula

3/2" wound

1/2" wound

**Defs. Resp. Mtn Exclude App.  29**

## Toxicology Test Results

Office of Chief Medical Examiner
Toxicology Laboratory Service
200 Feliks Gwozdz Place
Fort Worth, Texas 76104
Name: Jermaine N Darden
Case Number: 1306402
Toxicology Work Number: 1301215

Nizam Peerwani, M.D., DABFP
Chief Medical Examiner
Robert Johnson, PH.D., DABFT
Chief Toxicologist
Priority: 0

Service Request Number: 003

| Specimen | Drug | Result | Drug Amount | Performed By |
|---|---|---|---|---|
| FEMORAL BLOOD | ETHANOL | NEGATIVE | | I. HO |
| URINE | AMPHETAMINE ELISA | NEGATIVE | | B. LANDRY |
| URINE | METHAMPHETAMINE ELISA | NEGATIVE | | B. LANDRY |
| URINE | THC ELISA | NEGATIVE | | B. LANDRY |
| URINE | OPIATES ELISA | NEGATIVE | | B. LANDRY |
| URINE | COCAINE ELISA | NEGATIVE | | B. LANDRY |
| URINE | BENZODIAZEPINES ELISA | NEGATIVE | | B. LANDRY |
| URINE | OXYCODONE ELISA | NEGATIVE | | B. LANDRY |
| URINE | ACID | NEGATIVE | | T. FLOWERS |
| URINE | BASE | NEGATIVE | | T. FLOWERS |

Report Prepared By: _[signature]_

Approved By: _[signature]_

Approved Date: 6/5/13

**Defs. Resp. Mtn Exclude App.   30**



**NMS Labs**

3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900   Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, DABFT, DABCC-TC: Laboratory Director

CONFIDENTIAL

## Toxicology Report
Report Issued   06/15/2013 19:00

| | |
|---|---|
| Patient Name | DARDEN, JERMAINE N. |
| Patient ID | ME# 1306402 |
| Chain | 11443345 |
| Age | 34 Y |
| Gender | Male |
| Workorder | 13139386 |
| Page 1 of 3 | |

To:   10147
Tarrant County Medical Examiner
Office of the Medical Examiner
200 Feliks Gwozdz Place
Fort Worth, TX  761044919

### Positive Findings:

| Compound | Result | Units | Matrix Source |
|---|---|---|---|
| XLR-11 | Positive | ng/mL | Aortic Blood |

See Detailed Findings section for additional information

### Testing Requested:

| Analysis Code | Description |
|---|---|
| 9560B | Synthetic Cannabinoids Screen, Blood (Forensic) |

### Specimens Received:

| ID | Tube/Container | Volume/Mass | Collection Date/Time | Matrix Source | Miscellaneous Information |
|---|---|---|---|---|---|
| 001 | Red Vial | 3.25 mL | 05/17/2013 11:11 | Aortic Blood | |

All sample volumes/weights are approximations.
Specimens received on 05/31/2013.

v.6

**Defs. Resp. Mtn Exclude App.  31**



CONFIDENTIAL

| | |
|---|---|
| Workorder | 13139300 |
| Chain | 11443345 |
| Patient ID | ME# 1306402 |

Page 2 of 3

## Detailed Findings:

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| XLR-11 | Positive | ng/mL | 0.10 | 001 - Aortic Blood | LC-MS/MS |

Other than the above findings, examination of the specimen(s) submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.

## Reference Comments:

1.  XLR-11 (K2, Space, Spice, Spike, Synthetic Cannabinoids, Yucatan Fire) - Aortic Blood

    XLR-11, a synthetic cannabinoid, has been identified in products sold as 'herbal incense'. These products are sold under a wide variety of names including (but not limited to) Spice, Yucatan Fire, Smoke, Sence, K2 Skunk, Space, K2 Citron, and K2 Blonde. These products may be used as an alternative to cannabis. No information is available on the metabolism of XLR-11 or expected blood, serum or plasma concentrations following use.
    Testing for this analyte was qualitative only. Quantitative analysis is available upon request; please contact the laboratory for more information.

Chain of custody documentation has been maintained for the analyses performed by NMS Labs.

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded six (6) weeks from the date of this report, and generated data will be discarded five (5) years from the date the analyses were performed.

## Analysis Summary and Reporting Limits:

Acode 5960B - Synthetic Cannabinoids Confirmation, Blood (Forensic) - Aortic Blood

-Analysis by High Performance Liquid Chromatography/Tandem Mass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| A-796260 | 0.10 ng/mL | JWH-081 | 0.10 ng/mL |
| AM-1248 | 0.10 ng/mL | JWH-122 | 0.10 ng/mL |
| AM-2201 | 0.10 ng/mL | JWH-200 | 0.10 ng/mL |
| AM-2233 | 0.10 ng/mL | JWH-203 | 0.10 ng/mL |
| AM-694 | 0.10 ng/mL | JWH-210 | 0.10 ng/mL |
| JWH-018 | 0.10 ng/mL | JWH-250 | 0.10 ng/mL |
| JWH-018 5-chloropentyl | 0.10 ng/mL | RCS-4 | 0.10 ng/mL |
| JWH-019 | 0.10 ng/mL | RCS-8 | 0.10 ng/mL |
| JWH-022 | 0.10 ng/mL | UR-144 | 0.20 ng/mL |
| JWH-073 | 0.10 ng/mL | XLR-11 | 0.10 ng/mL |

Acode 9560B - Synthetic Cannabinoids Screen, Blood (Forensic) - Aortic Blood

-Analysis by High Performance Liquid Chromatography/Tandem Mass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| A-796260 | 0.20 ng/mL | JWH-019 | 0.10 ng/mL |
| AM-1248 | 0.20 ng/mL | JWH-022 | 0.10 ng/mL |
| AM-2201 | 0.10 ng/mL | JWH-073 | 0.10 ng/mL |
| AM-2233 | 0.20 ng/mL | JWH-081 | 0.10 ng/mL |
| AM-694 | 0.10 ng/mL | JWH-122 | 0.20 ng/mL |
| JWH-018 | 0.10 ng/mL | JWH-200 | 0.20 ng/mL |
| JWH-018 5-chloropentyl | 0.10 ng/mL | JWH-203 | 0.20 ng/mL |

v.8

**Defs. Resp. Mtn Exclude App.  32**



CONFIDENTIAL

Workorder   13139300
Chain       11443345
Patient ID:  ME# 1306402

Page 3 of 3

Analysis Summary and Reporting Limits:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|----------|-----------|----------|-----------|
| JWH-210 | 0.10 ng/mL | RCS-8 | 0.10 ng/mL |
| JWH-250 | 0.10 ng/mL | UR-144 | 0.10 ng/mL |
| RCS-4 | 0.10 ng/mL | XLR-11 | 0.20 ng/mL |

v.8

**Defs. Resp. Mtn Exclude App.  33**

TARRANT COUNTY MEDICAL EXAMINER'S DISTRICT
SERVING TARRANT, PARKER, & DENTON COUNTIES
Investigator's Report

CASE #: 1306402        Tarrant        TYPE: Jurisdiction                IDENTITY: Identified

NIZAM PEERWANI, M.D.                                            MICHAEL FLOYD
CHIEF MEDICAL EXAMINER                        CHIEF FORENSIC DEATH INVESTIGATOR
DECEASED: Jermaine N Darden
ADDRESS: 3232 Tannisch Ave, Fort Worth, Texas 76105
AGE: 34                    BIRTH DATE:                    MARITAL STATUS: Married
PHONE:                     RACE OR COLOR: Black           SEX: M
HEIGHT:                    WEIGHT:
SSN:                       MANNER OF DRESS: Boxers
OCCUPATION:
PLACE OF EMPLOYEMENT:

DATE OF DEATH: 5/16/2013              TIME OF DEATH: 17:06
PLACE OF DEATH DESCRIPTION: Hospital ER
ADDRESS OF DEATH: 1575 South Main Street, Fort Worth, Texas 76104
HOSPITALIZED: Yes
ADMIT DATE: 5/16/2013          ADMIT TIME: 17:06
ENVIRONMENT CONDITION: Indoors
CHARACTERISTIC OF PREMISES: Private residence
DATE/TIME ME NOTIFIED: 5/16/2013 17:22
ARRIVED:
REPORTING PERSON: Janet Rogers, RN
REPORTING AGENCY: John Peter Smith Hospital
ADDRESS: 1575 South Main Street, Fort Worth, Texas 76104
PHONE: (817) 702-3417
PRONOUNCED DEAD BY: Dr. Janet Rogers
PRONOUNCING AGENCY: John Peter Smith Hospital
LAST TREATED BY:
DATE/TIME OF OCCURENCE 5/16/2013 16:30
INJURY AT WORK: NO
PLACE OF OCCURENCE: Private residence
LOCATION: 3232 Tannisch Ave., Fort Worth, Texas 76105
TRAUMA RELATED: Yes
IDENTIFIED BY: Kyle Finney
IDENTIFICATION TYPE: Visual
DATE/TIME OF IDENTIFICATION: 5/16/2013 - Time: 21:45
IDENTIFICATION STATUS: Positive ID
COMMENTS:
ADDRESS:
PHONE:

NEXT OF KIN NOTIFICATION DATE/TIME: 5/16/2013 2145
NOTIFIED BY: FDI Kyle Finney
NOTIFYING AGENCY: TCME
NEXT OF KIN NAME: Dimeski Goodacre
RELATIONSHIP: Wife
COMMENTS:
ADDRESS: , Fort Worth, 76105 Texas
PHONE: (682) 365-7263
BODY TO:                           CONVEYANCE: Accucare
FUNERAL HOME:

5/17/2013
Page 1

**Defs. Resp. Mtn Exclude App.  34**

TARRANT COUNTY MEDICAL EXAMINER'S DISTRICT
SERVING TARRANT, PARKER, & DENTON COUNTIES

INVESTIGATOR'S REPORT

NIZAM PEERWANI, M.D.                         MICHAEL FLOYD
CHIEF MEDICAL EXAMINER                       CHIEF FORENSIC DEATH INVESTIGATOR
Case Number: 1306402                         Case Type: Jurisdiction

DECEDENT'S NAME: Jermaine N. Darden          AGE: 34
ADDRESS: 3232 Thannisch Ave, Fort Worth, Texas 76105
BIRTH DATE:        X        MARITAL STATUS: Married          PHONE:

CASE NO. 1306402 Tarrant

The decedent is a 34-year-old black male who became unresponsive after being tasered twice by the Fort Worth Police Department. Fort Worth Police Detective Roloff advises that their agency deployed an X2 taser twice on the decedent when he became physically non-compliant to their instructions while serving a narcotics search warrant.
Total # of photos: 0

DESCRIPTION OF BODY:

The body was viewed at the TCME. The decedent presents as a black male, clad in boxer shorts and is cool to the touch. Rigor mortis is developing, lividity could not be observed and there was evidence of invasive medical intervention. There were two small defects observed on the middle of the decedent's back.

MEDICAL HISTORY:

The decedent's brother advises that the decedent has a history of hypertension. Detective Roloff advises the decedent stated that he had asthma after being tasered the second time and that he was experiencing labored breathing. Melissa of the John Peter Smith Hospital states that there was no admit fluid drawn upon admission and that Epinephrine and Narcan was administered to the decedent while CPR was being administered. Medical records from John Peter Smith Hospital were sent with the decedent and included with the case file.

DETAILS OF INCIDENT:

Micki Hayden, RN of the John Peter Smith Hospital reported that on 5/16/2013 at approximately 1706 hours the decedent was admitted to their emergency room with CPR in progress after allegedly being tasered by the Fort Worth Police Department while serving a narcotics warrant and that the decedent was pronounced at 1709 hours.

Detective Roloff of the Fort Worth Police Department advises that on 5/16/2013 at approximately 1600 hours their department executed a narcotics search warrant at a residence. The decedent was ordered to the ground inside the residence by officers, to which he initially complied. Roloff advises that an officer who weighs approximately 140 lbs, attempted to handcuff the decedent, the decedent became physically non-compliant and stood up with the officer on the decedent's back. Roloff says that a second officer attempted to assist but the decedent continued to walk towards an adjacent room, while struggling with the officers. Roloff states that an officer deployed a Taser Model X2 on the decedent for a five second cycle. The decedent initially began to comply with the officers instructions but stood up again and continued to walk into an adjacent room. A second five second cycle was deployed and the decedent went to the ground and was handcuffed. Roloff states that the

**Defs. Resp. Mtn Exclude App.   35**

Case No. 1306402, Tarrant County Medical Examiner's Office

decedent was still conscious and complained that he had asthma and began to have labored breathing and the decedent then became unresponsive. EMS services were called to the scene and transported the decedent to John Peter Smith Hospital where he was pronounced.

This investigator spoke with the decedent's mother, Donna Randle, who advises that she was on scene at the residence and positively identified the decedent.

This investigator spoke with the decedent's mother and advised her of TCME protocols.

**Instrument Causing Injury:**

Taser                                        Model                                        X2

**ORGAN TISSUE DONOR:**
There is no signed consent form to allow harvesting of organs or tissue.

**FOLLOW UP INVESTIGATIONS REQUIRED**

No follow-up investigation is needed at this time.

**COMMENTS:**

There was no property to be removed from the decedent.

Kyle P. Finney

**Defs. Resp. Mtn Exclude App.   36**

# TARRANT COUNTY MEDICAL EXAMINER'S DISTRICT
## SERVING TARRANT, PARKER, & DENTON COUNTIES
### Investigator's Report

CASE #: 1306402          Tarrant          TYPE: Jurisdiction          IDENTITY: Identified.

NIZAM PEERWANI, M.D.                                    MICHAEL FLOYD
CHIEF MEDICAL EXAMINER              CHIEF FORENSIC DEATH INVESTIGATOR

NAME OF RELEASING AUTHORITY:

RELATIONSHIP:

DISPOSITION OF PROPERTY:

MEDICAL INVESTIGATOR:
Kyle Finney

Defs. Resp. Mtn Exclude App.  37

# EXHIBIT C

Defs. Resp. Mtn Exclude App.   38

Tasha Greenberg
July 11, 2016                                                  1

Page 1

1           IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF TEXAS
2                 FORT WORTH DIVISION

3    ERIC DARDEN, as administrator)
     Of the Estate of Jermaine    )
4    Darden                        )
                                   )
5    V.                            )   CIVIL ACTION
                                   )   NO. 4:15-CV-221-A
6                                  )
     THE CITY OF FORT WORTH,       )
7    TEXAS, et al.                 )

8

9

10   *********************************************************

11              ORAL AND VIDEOTAPED DEPOSITION

12                 TASHA GREENBERG, M.D.

13                    JULY 11, 2016

14   *********************************************************

15

16

17

18        ORAL AND VIDEOTAPED DEPOSITION OF TASHA

19   GREENBERG, M.D., a witness produced at the instance of

20   the Plaintiff, was taken in the above-styled and

21   numbered cause on the 11th day of July 2016, from

22   4:15 p.m. to 7:38 p.m., before Dawn Baldwin, CSR in and

23   for the State of Texas, reported by machine shorthand,

24   at the City of Fort Worth, Office of the City Attorney,

25   1000 Throckmorton Street, Fort Worth, Texas.

U.S. LEGAL SUPPORT
(214) 741-6001



**Defs. Resp. M/n Exclude App. 39**

Tasha Greenberg
July 11, 2016                                    2 to 5

Page 2

A P P E A R A N C E S

1
2  FOR THE PLAINTIFF:
3     Daryl K. Washington
      LAW OFFICE OF DARYL K. WASHINGTON, P.C.
4     325 N. St. Paul Street, Suite 3950
      Dallas, Texas 75201
5     (214) 880-4883
      E-mail: dwashington@dwashlawfirm.com
6
7  FOR THE DEFENDANT W.F. SNOW:
8
9     Kenneth E. East
      FOSTER & EAST
10    5001 Airport Freeway, Suite 675
      North Richland Hills, Texas 76180
11    (817) 788-1111
      E-mail: ken@fostereast.com
12
13
14 FOR THE DEFENDANT THE CITY OF FORT WORTH, TEXAS
15    Laetitia Brown
      CITY OF FORT WORTH
16    SENIOR ASSISTANT CITY ATTORNEY
      1000 Throckmorton Street
17    Fort Worth, Texas 76102
      (817) 592-6639
18    E-mail: laetitia.brown@fortworthgov.org
19
20
21
22 ALSO PRESENT:
23    Anthony Marler, Videographer
24
25

Page 3

T A B L E   O F   C O N T E N T S

1
2                                                Page
3  APPEARANCES........................     2
4
   TASHA GREENBERG, M.D.
5
      Examination by Mr. Washington..............     5
6
7
8
   Reporter's Certificate....................   124
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

E X H I B I T S

1
2  No.   Description                           Page
3  28    Letter from Tasha Greenberg, M.D. to    15
         Kenneth E. East dated May 3, 2016
4
   29    Autopsy Report                          32
5
6  30    Pharmacology, Toxicology and Adverse    68
         Effects of Synthetic Cannabinoid Drugs
7  31    Synthetic Cannabinoid Drug Use as a     69
         Cause or Contributory Cause of Death
8
   32    Accepted Manuscript, Title: Case Reports  71
9         of Synthetic Cannabinoid XLR-11
          Associated Fatalities
10
11 33    Letter from Jonathan A. Briskin, M.D. to  73
         Daryl K. Washington dated May 2, 2016
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

P R O C E E D I N G S

1
2      THE VIDEOGRAPHER:  We're now on record.  The
3  date is July 11, 2016.  The time is 4:15 p.m.  This is
4  the videotape deposition of Dr. Tasha Greenberg in the
5  matter of Eric Darden, et al., versus the City of Fort
6  Worth, Texas, Cause No. 415-CV-221-A.  This deposition
7  is being held at the Office of the City Attorney in Fort
8  Worth, Texas.
9      Will counsel please state your names for the
10 record?
11     MR. WASHINGTON:  Daryl Washington for the
12 Plaintiff, Eric Darden.
13     MS. BROWN:  Laetitia Coleman Brown for the
14 City of Fort Worth.
15     MR. THOMAS:  Lee Thomas for Officer Romero.
16     MR. EAST:  Kenneth East for Defendant
17 Officer Snow.
18     THE VIDEOGRAPHER:  Will the court reporter
19 please swear in the witness?
20     TASHA GREENBERG, M.D.,
21 having been first duly sworn, testified as follows:
22                  EXAMINATION
23 BY MR. WASHINGTON:
24     Q.  Can you please state your name for the record?
25     A.  Tasha Zemrus Greenberg.

**Defs. Resp. Mtn Exclude App. 40**

Tasha Greenberg
July 11, 2016
6 to 9

Page 6

1   Q.  What is your middle name?
2   A.  It's Zemans, Z as in zebra, E, M as in Mary,
3   R-U-S, as in Sam.
4   Q.  What is your -- I'm sorry, what is your date of
5   birth, Dr. Greenberg?
6   A.  3-27-66.
7   Q.  And what's your current address?
8   A.  Work or home.
9   Q.  Work on this one.
10  ▓▓▓▓▓▓ Feliks Gwozdz Place in Fort Worth.
11  Q.  Zip code?
12  A.  76104.
13  Q.  And what's your home address?
14  A.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
15  ▓▓▓▓▓▓▓
16  Q.  And how are you currently employed?
17  A.  I am a deputy medical examiner at the Tarrant
18  County Medical Examiner's Office in Fort Worth.
19  Q.  Do you teach any courses at any universities?
20  A.  Not at this time, no.
21  Q.  Have you ever?
22  A.  Sorry, I'm trying -- yes, I -- yes, in the past.
23  It's been a while, though.
24  Q.  Which school?
25  A.  The University of Maryland.

Page 7

1   Q.  And what courses did you lecture at the
2   University of Maryland?
3   A.  That was a course for medical students in death
4   certification.  And I also gave lectures when I was
5   working at UT Southwestern in Dallas.
6   Q.  What year were you working at UT Southwestern?
7   A.  That was in 2009 through 2012.
8   Q.  I'm going to try to make this as short as
9   possible, but have you ever taught any courses on
10  XLR-11, and to be short, the synthetic cannabinoid?
11  A.  Cannabinoid.
12  Q.  Cannabinoid.  All right.  Have you ever taught
13  any courses?
14  A.  No.
15  Q.  Have you ever taken any type of training on that?
16  A.  No.
17  Q.  Have you received any type of certification?
18  A.  I don't believe there is any, but no.
19  Q.  And how familiar are you with it?
20      MR. EAST:  Objection; vague.
21  A.  I'm as familiar with it as I am with other drugs
22  that we routinely test for as far as reading books and
23  other publications and consulting with our forensic
24  toxicologist.
25  Q.  How often do you read books and publications --

Page 8

1   and for short, I'm going to refer to it as a synthetic
2   drug.  Is that fair?
3   A.  Yes.
4   Q.  How often do you read any publications on the
5   synthetic drug?
6   A.  Only as necessary.
7   Q.  And how familiar would you consider yourself to
8   be with that particular drug?
9       MR. EAST:  Objection; vague.
10  A.  Again, I have recently been reading articles
11  about the drug and so as familiar as I can be with those
12  publications.
13  Q.  Did you start reading these publications as a
14  result of you having to give testimony in this trial?
15  A.  No.  I had looked into it previously when this
16  case was originally examined, which would have been back
17  in 2013.
18  Q.  Prior to the case being examined, you did not
19  have any experience with this synthetic drug?
20  A.  Not this particular synthetic cannabinoid, no.
21  Q.  So based on your experience at the time that this
22  incident occurred, you wouldn't have had the experience
23  and training to be able to make a determination whether
24  or not that drug was a contributing factor to
25  Mr. Darden's death?

Page 9

1   A.  As far as I know, there is no specific training
2   in that area.  My ability to make a ruling on that is
3   based on what information was out there at the time.  I
4   believe there's been a few additional publications since
5   then that I was able to look at recently.  So using what
6   was available at the time is where I had given my
7   original statement that the role of this drug or its
8   effects was a bit uncertain.
9   Q.  So sitting here today, you're not going to give
10  testimony or you will not be giving any type of
11  testimony indicating that this drug perhaps was a cause
12  of Mr. Darden's death based on the information that you
13  had at the time of the autopsy?
14  A.  The information that I indicated in my original
15  report was that there are certain effects of the
16  synthetic cannabinoids that can potentially play a role
17  in death and gave the statement that it was uncertain if
18  there was a role, and that is basically, even with
19  additional information, the same basic statement.
20  Q.  So your opinion would be that it's uncertain?
21  A.  Yes.
22  Q.  Have you ever had any license suspended or
23  revoked?
24  A.  No, sir.
25  Q.  Have you ever been disciplined by any

Tasha Greenberg
July 11, 2016                                    10 to 13

Page 10

1  professional association or society?
2      A.  No.
3      Q.  Is it your understanding that you have been
4  retained by one or more of the parties to provide to the
5  Court or the jury what is called expert testimony?
6      A.  Yes.
7      Q.  And who have you been retained by?
8      A.  I was consulted by Mr. East.
9      Q.  And do you know who you was retained by?
10     A.  I'm not exactly sure what that would be.  I'm not
11 sure if it's him or if it's the City, to be honest.
12     Q.  And what is your understanding of your role in
13 this case as far as providing expert testimony?
14     A.  My understanding was explanation of the autopsy
15 results and the logic for the conclusions drawn.
16     Q.  And have you had the opportunity to see
17 Dr. Briskin's expert report?
18     A.  Dr. Briskin, yes.
19     Q.  Yes.  Is there anything in Dr. Briskin's expert
20 report that you disagree with?
21     A.  Yes.
22     Q.  Dr. Briskin indicated that he disagreed that the
23 cause of Mr. Darden's death was natural?
24     A.  That would be the manner.
25     Q.  Is it your testimony to the jury that Mr. Darden

Page 11

1  would have died on that day regardless of the struggles
2  that took place?
3      A.  I can't say for certain that he would have died
4  on that day.  All I can say for certain is that he did
5  have significant underlying natural disease processes
6  that put him at risk for a sudden death pretty much at
7  any time.
8          MR. WASHINGTON:  Objection; nonresponsive.
9      Q.  Can you explain to the jury what do you mean by
10 Mr. Darden's death -- the manner of his death was
11 natural?
12     A.  So the manner of death is a classification of --
13 a classification of death that is used in -- to fill out
14 a death certificate, and there are different categories
15 of that.  In this particular case, the case was reviewed
16 in our office at our critical case review meeting on two
17 occasions by multiple people in our office, and the
18 consensus was to rule this case a natural death.
19         MR. WASHINGTON:  Objection; nonresponsive.
20     Q.  My question is I want you to explain to the jury
21 what is the meaning of a death -- the manner of the
22 death being natural.
23     A.  That means --
24         MR. EAST:  Objection; vague, asked and
25 answered.  But you can answer.

Page 12

1      A.  The meaning is that the underlying natural
2  conditions are considered the most significant factors
3  in this death.
4          MR. WASHINGTON:  Can we go off the record
5  for a second?
6          THE VIDEOGRAPHER:  Now off record at
7  4:25 p.m.
8          (Break taken from 4:25 to 4:27.)
9          THE VIDEOGRAPHER:  Now on record at
10 4:27 p.m.
11         MR. WASHINGTON:  Can you read the last
12 question?  I'm sorry.
13         (Requested portion read back.)
14     Q.  (By Mr. Washington)  Now, Dr. Greenberg, are you
15 aware that in the context of the expert who's giving
16 testimony whether or not the jury is entitled to know
17 whether or not you have any type of bias or potential
18 bias in testifying on behalf of the Defendants?
19     A.  Sure.
20     Q.  And do you have any potential biases?
21     A.  I do not.
22     Q.  You understand that your -- the autopsy and
23 opinion that was given by the Tarrant County Medical
24 Examiner's Office is being challenged?
25     A.  Well, I do now, yes.

Page 13

1      Q.  And you understand -- you do understand that if
2  you have any type of potential biases, that it would be
3  proper for you to reveal those?
4          MR. EAST:  Objection; argumentative, asked
5  and answered.
6      A.  Yes.
7      Q.  Dr. Greenberg, have you ever given your
8  deposition before?
9      A.  Yes.
10     Q.  Okay.  And how many times have you given your
11 deposition?
12     A.  Not very many.  Two, maybe three times.
13     Q.  Have you ever had to testify on behalf of the
14 City of Fort Worth?
15     A.  No.
16     Q.  Have you ever worked with Ken East before?
17     A.  No.
18     Q.  Have you ever worked with Lee Thomas before?
19     A.  No.
20     Q.  Do you -- are you -- strike that question.  Do
21 you know whether or not the Tarrant County Medical
22 Examiner has ever been challenged by an expert by the
23 name of Crow -- last name of Crow regarding the causes
24 of death?
25     A.  I do not.

Tasha Greenberg
July 11, 2016                          46 to 49

**Page 46**

1    A.  Is there something specific that you're referring
2    to as far as opinions?
3    Q.  No.  I want to know the opinions that you reach.
4    You understand that you were retained as an expert to
5    give opinions in this case, correct?
6    A.  Yes.
7    Q.  And I'm asking you to tell the jury the opinions
8    that you reached.
9    A.  The conclusions that were made regarding this
10   case were that -- that we determined a cause of death
11   that was ruled a sudden cardiac death associated with
12   hypertensive atherosclerotic cardiovascular disease and
13   application of restraint with obesity, hepatic steatosis
14   and chronic thyroiditis as contributory conditions.
15   Q.  So, in your opinion, you took into consideration
16   that there was an application of restraint, correct?
17   A.  Yes.
18   Q.  Despite that, you indicated that the manner of
19   death was ruled as natural?
20   A.  That was the consensus opinion, yes.
21   Q.  I'm asking about your opinion.  You're the expert
22   testifying in this case.  You indicated that there
23   was -- there was an application of restraint --
24   A.  Yes.
25   Q.  -- correct?  And you do agree that the

**Page 47**

1    application of restraint can cause some type of injury
2    and/or death?
3                 MR. EAST:  Objection.
4    A.  Depending on the type of restraint, yes.
5    Q.  You did not describe the type of restraints in
6    here, did you?
7    A.  I believe I did.
8    Q.  Why don't you point out the type of restraints?
9                 MR. EAST:  Objection; best evidence.
10   A.  There's taser deployment and physical restraint.
11   There's held down while being handcuffed.
12   Q.  And wasn't the struggle with police listed as a
13   factor in the cause of death?
14   A.  It was listed, yes, it was.
15   Q.  In fact, can you point that out in the autopsy
16   report?
17   A.  In the autopsy report?
18   Q.  Yes, where they listed struggle with the police
19   as a factor in the cause of death.
20   A.  It is listed as application of restraint in the
21   cause of death.
22   Q.  So how can you have that as a factor, yet list
23   the manner of death as natural?
24   A.  The underlying natural conditions were considered
25   the most significant factor in this case.

**Page 48**

1                 MR. WASHINGTON:  Objection; nonresponsive.
2    Q.  If one of the officers would have died in this
3    struggle, would you have considered their death to be
4    natural?
5                 MR. EAST:  Objection; calls for speculation.
6                 MS. BROWN:  Objection; calls for
7    speculation.
8                 MR. EAST:  Incomplete hypothetical.
9    A.  I can't answer that without more specifics.
10   Q.  Now, wouldn't you agree that the interjection of
11   a struggle changes the manner of death to an accident?
12   A.  I think that the determination of the manner is
13   open to interpretation.  Whether it could be considered
14   an accident or could be considered undetermined all are
15   dependent upon who's reviewing it and --
16   Q.  Okay.  Again, my question to you is, the
17   interjection of struggle could change the manner of
18   death to accident?
19                 MR. EAST:  Objection; asked and answered.
20   A.  It -- a different manner of death certainly could
21   be considered as an opinion by a different expert or
22   office.
23   Q.  And, Doc, there is nothing that you have that
24   would have indicated that he would have died that day
25   without police intervention or the struggle that he was

**Page 49**

1    involved in?
2    A.  He did have significant underlying natural
3    disease, including a significant blockage of one of his
4    major coronary arteries that is known to be a reason for
5    sudden death, in particular with his enlarged heart and
6    the obesity as an additional risk factor.  That
7    certainly can lead to a sudden cardiac death even in the
8    absence of a struggle.
9                 MR. WASHINGTON:  Objection; nonresponsive.
10   Q.  Dr. Greenberg, would the witness call it -- would
11   you call the manner of death an accident or a homicide
12   if somebody was struggling with an individual to take
13   their wallet?
14                 MR. EAST:  Objection; calls for speculation,
15   incomplete hypothetical.
16   A.  It would depend on the other findings involved in
17   the case.
18   Q.  Or if one of the officers had cardiac disease and
19   he died during the struggle with Mr. Darden, would you
20   classify that officer's death as natural?
21                 MR. EAST:  Same objections.
22                 MS. BROWN:  Objection; speculation.
23   A.  Again, it would certainly depend on all of the
24   circumstances as well as the examination findings, so I
25   can't say for certain what a ruling would be.

Tasha Greenberg
July 11, 2016                                         122 to 125

Page 122

1  testify on or not.
2      Q.  Well, this is -- this is your opinion, correct?
3          MR. THOMAS:  Asked and answered.
4          MS. BROWN:  Same objection.
5      A.  This was the explanation for the opinion.
6      Q.  And there is nothing that you disagree with other
7  than the placements of the darts in Mr. Darden's back --
8  strike that.  There is nothing that you disagree with in
9  Dr. Briskin's report other than the placement of the
10  darts in his back, correct?
11         MR. EAST:  Objection; asked and answered.
12         MR. THOMAS:  Objection.
13     A.  I would disagree as far as whether or not the
14  restraint activities are the reason for his sudden
15  cardiac arrest.
16     Q.  But you would agree that different doctors come
17  up with different opinions, correct?
18     A.  Absolutely.
19     Q.  It doesn't make yours right and it doesn't make
20  his right?
21         MS. BROWN:  Objection; argumentative.
22     Q.  Correct?
23         MR. THOMAS:  Calls for speculation.
24     A.  They are different opinions.
25     Q.  And there's nothing, based on your medical

Page 123

1  expertise, that Dr. Briskin is saying in his report that
2  does not make sense?
3          MR. THOMAS:  Asked and answered.
4      A.  Again, as I said before, the issue about the
5  darts and the spinal cord injury, to me, does not make
6  sense.  And again, in the view of the video that we have
7  reviewed, I still take issue with what I'm seeing here
8  as far as him being seated.
9      Q.  But you would agree that Dr. Briskin is not
10  indicating in his report that the taser is the sole
11  cause of Mr. Darden's death?
12         MS. BROWN:  Objection; asked and answered.
13     A.  Yes.
14         MR. WASHINGTON:  Pass the witness.
15         MS. BROWN:  No questions.
16         MR. EAST:  Reserve mine.
17         MR. THOMAS:  Reserve.
18         THE VIDEOGRAPHER:  We're now off record at
19  7:38 p.m.
20                [END OF PROCEEDINGS]
21
22
23
24
25

Page 124

1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF TEXAS
2                  FORT WORTH DIVISION
3  ERIC DARDEN, as administrator)
   Of the Estate of Jermaine   )
4  Darden                       )
                                )
5       V.                      )  CIVIL ACTION
                                )  NO. 4:15-CV-221-A
6                               )
   THE CITY OF FORT WORTH,      )
7  TEXAS, et al.                 )
8
9  ***********************************************************
10              REPORTER'S CERTIFICATION
11
12      I, Dawn Baldwin, a Certified Shorthand Reporter
13  duly commissioned and qualified in and for the State of
14  Texas, do hereby certify that there came before me on
15  the 11th day of July, 2016, at the City of Fort Worth,
16  Office of the City Attorney, 1000 Throckmorton Street,
17  Fort Worth, Texas 76102, the following named person,
18  to-wit:  TASHA GREENBERG, M.D., who was duly sworn to
19  testify the truth, the whole truth, and nothing but the
20  truth of knowledge touching and concerning the matters
21  in controversy in this cause; and that he was thereupon
22  examined upon oath and his examination reduced to
23  typewriting under my supervision; that the deposition is
24  a true record of the testimony given by the witness.
25      I further certify that pursuant to FRCP Rule

Page 125

1  30(e)(1) that the signature of the deponent:
2      ___was requested by the deponent or a party
3  before the completion of the deposition;
4      _X_was not requested by the deponent or a party
5  before the completion of the deposition.
6      I further certify that I am neither attorney or
7  counsel for, nor related to or employed by any of the
8  parties or attorneys in the action in which this
9  proceeding was taken, and further that I am not a
10  relative or employee of any attorney or counsel employed
11  by the parties hereto, or financially interested in the
12  action.
13      CERTIFIED TO BY ME on this the 14th day of July,
14  2016.
15
16
                _____
17              DAWN BALDWIN, Texas CSR
                Expiration Date:  12/31/16
18              U.S. LEGAL SUPPORT, Firm #343
                5910 N. Central Expressway, Suite 100
19              Dallas, Texas  75206
                (214) 742-6001
20
21
22
23
24
25

Defs. Resp. Mtn Exclude App.  44